**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074) (*pro hac vice application forthcoming*)
Shireen M. Clarkson (SBN 237882) (*pro hac vice application forthcoming*)
Celine Cohan (SBN 282661) (*pro hac vice application forthcoming*)
9255 Sunset Blvd., Suite 804
Los Angeles, CA 90069
Telephone: (213) 788-4050
Facsimile: (213) 788-4070
rclarkson@clarksonlawfirm.com
sclarkson@clarksonlawfirm.com
ccohan@clarksonlawfirm.com

**TYCKO & ZAVAREEI, LLP**
Annick M. Persinger (SBN 272996) (*pro hac vice application forthcoming*)
483 Ninth Street, Suite 200
Oakland, CA 94607
Telephone: (510) 254-6808
apersinger@tzlegal.com

**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
James C. Shah (SBN 260435)
475 White Horse Pike
Collingswood, NJ 08107
Telephone: (856) 858-1770
Facsimile: (866) 300-7367
jshah@sfmslaw.com

*Attorneys for Plaintiff Holly Deibler and the
Putative Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOLLY DEIBLER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SANMEDICA INTERNATIONAL, LLC and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT:**<br><br>1. VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT (N.J.S.A § 56:8-1, *et seq.*)<br><br>2. BREACH OF EXPRESS WARRANTY (N.J.S.A. § 12A:2-313, *et seq.*)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Holly Deibler ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Complaint against SanMedica International, LLC ("SanMedica"), and Does 1 through 10, inclusive (collectively, "Defendants"). Plaintiff makes the allegations herein upon personal knowledge as to herself and her own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by her attorneys and her retained experts.

## SUMMARY OF THE ACTION

1.     This is a class action lawsuit brought on behalf of all New Jersey purchasers of SeroVital-hgh ("SeroVital" or "Product"), a purported human growth hormone ("HGH") supplement touted by Defendants as an anti-aging miracle which can increase HGH levels by 682% and thereby cause "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, [and] heightened sex drive" so as to make "users look and feel decades – not years, but *DECADES* – younger."   The Product is sold online and at numerous retail outlets throughout New Jersey.   A true and correct representation of the Product's front label is shown below.

2.      In reality, the Product provides consumers with nothing more than a false promise. The scientific community confirms that: (1) the Product cannot increase HGH levels whatsoever, let alone by 682%; (2) the Product does not reduce wrinkles, "decrease[] body fat," "increase[] lean muscle mass," strengthen bones, "improve[] mood," "heighten[] sex drive," or make "users look and feel decades … younger" because the oral administration of amino acids like SeroVital does not increase growth hormone bioactivity; (3) there is no causal link between increased HGH levels and most of the claimed results, including wrinkle reduction, increased lean muscle mass, stronger bones, improved mood, [or] heightened sex drive; and (4) if SeroVital were to increase HGH levels as claimed, it would cause significant health risks.

3.      SeroVital does not increase serum HGH levels. As Plaintiff's expert, Shlomo Melmed, M.D. ("Dr. Melmed"), confirms, peer-reviewed scientific publications reveal that low dose *oral* amino acids like SeroVital do not escalate HGH levels.  Indeed, Defendants' advertising is false and misleading because, as Dr. Melmed explains, "the oral ingestion of SeroVital is not significantly different from a placebo."  Another expert, David H. Madoff, M.D., Ph.D. ("Dr. Madoff"), reached the same conclusion based on Defendants' own study: that there is "no statistically significant difference in total GH levels over the two hours (AUC) following SeroVital compared to placebo treatment."  Thus, based on peer-reviewed

scientific publications, Defendant's study, and expert testimony, Defendant's claim that the Product increases HGH levels by 682% is provably false and misleading.

4.     Although Defendants claim that the Product increases HGH, and that increases of HGH "decrease[] body fat," "increase[] lean muscle mass," strengthen bones, "improve[] mood," "heighten[] sex drive," or make "users look and feel decades … younger," as Plaintiff's experts and the scientific consensus confirm, the Product does not provide "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making uses look and feel decades younger."  Dr. Melmed confirms that the Product is not associated with these benefits because, based on the scientific consensus regarding oral amino acids, as well as the information available regarding SeroVital, oral administration of amino acids like those in SeroVital does not increase HGH bioactivity.  Accordingly, based on scientific consensus and expert testimony, Defendants' claim that the Product provides HGH, which drastically increases weight loss and offers significant anti-aging benefits, is provably false and misleading.

5.     In short, the Product is no more effective for its advertised purposes than a placebo, and is therefore worthless to New Jersey consumers who, upon information and belief, have collectively expended tens of millions of dollars or more on the Product during the proposed six-year class period.

## PARTIES

6.      Plaintiff is, and at all times relevant hereto was, a citizen of New Jersey residing in Atlantic County.  Throughout 2015, Plaintiff viewed television and print advertisements for SeroVital.  In or around January 2016, Plaintiff called the phone number she viewed on the television advertisements and placed an order for SeroVital directly with SanMedica over the phone.  Plaintiff purchased 18 boxes of SeroVital ($99 per box) for a total discounted price of approximately $1,300, with each box containing a 30-day supply of the Product.  Plaintiff purchased the Product in reliance upon the Product's advertised ability to increase HGH levels and provide Plaintiff with "decreased body fat," "increased lean muscle mass," a "heightened sex drive," an "improved mood," to "look and feel decades younger" and to "decrease[d ]wrinkles," as set forth in the television, print, and label advertisements for the Product.   Based on Defendant's claim that the Product increases HGH levels, Plaintiff reasonably believed that the increase in HGH levels purportedly caused by the Product would achieve the purported benefits of HGH listed on the label, including "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles."   Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims to mean that the Product would increase HGH levels by 682%, and that, as a result of that increase, Plaintiff would receive the claimed anti-aging benefits.

7.     Plaintiff received the boxes of Serovital in or around January 2016 and used the Product as directed.  However, as a result, Plaintiff did not receive any of the advertised HGH increasing or anti-aging benefits.  Plaintiff's body fat, muscle mass, sex drive, mood, and skin remained unchanged.  Moreover, Plaintiff—in no way, shape, or form—looked or felt younger, let alone by years or decades, as Defendants promised.  Had Plaintiff known that the Product would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises made were misleading and false, she would not have purchased the Product.  As it turned out, Plaintiff received zero benefits from the Product, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

8.     If the Product had functioned as advertised, Plaintiff would have purchased it in the future.  Since Plaintiff would like to purchase the Product again and achieve the advertised benefits, she might purchase it again in the future— despite the fact that it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the Product was improved.  In that regard, Plaintiff is an average consumer who is not sophisticated in the bioavailability or effects of HGH in different formulations, so she is at risk of reasonably, but incorrectly, assuming that Defendants fixed the formulation of the Product such that she might buy it again believing it was improved.

9.     SanMedica is a company headquartered in Salt Lake City, Utah, and maintains its principal place of business at 5742 West Harold Gatty Drive, Salt Lake City, Utah 84116.  SanMedica, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of New Jersey.  SanMedica is the owner, manufacturer, distributor, advertiser, and seller of the Product, and is the company that created and/or authorized the false, misleading, and deceptive advertisements and/or packaging and labeling for the Product.

10.     The true names and capacities, whether individual, corporate, associate, or otherwise of certain manufacturers, distributors, and/or their alter egos sued herein as Does 1 through 10 inclusive are presently unknown to Plaintiff, who therefore sues these individuals and/or entities by fictitious names.  Plaintiff will seek leave of this Court to amend the Complaint to show their true names and capacities when the same have been ascertained.  Plaintiff is informed and believes and based thereon alleges that Does 1 through 10 were authorized to do and did business in Atlantic County, New Jersey.  Plaintiff is further informed and therefore alleges that Does 1 through 10 were and/or are, in some manner or way, responsible for and liable to Plaintiff for the events, happenings, and damages hereinafter set forth below.

11.     Plaintiff is informed and believes, and based thereon alleges that, at all times relevant herein, each of these individuals and/or entities was the agent, servant, employee, subsidiary, affiliate, partner, assignee, successor-in-interest, alter ego, or other representative of each of the remaining Defendants and was acting in such capacity in doing the things herein complained of and alleged.

12.     In committing the wrongful acts alleged herein, Defendants planned and participated in and furthered a common scheme by means of false, misleading, deceptive, and fraudulent representations to induce members of the public to purchase the Product.  Defendants participated in the making of such representations in that it did disseminate, or cause to be disseminated, said misrepresentations.

13.     Defendants, upon becoming involved with the manufacture, advertising, and sale of the Product, knew or should have known that the claims about the Product's ability to raise HGH levels and deliver anti-aging benefits were false, deceptive, and misleading.  Defendants affirmatively misrepresented the benefits of the Product in order to convince the public and the Product's users to purchase and use the Product, resulting in profits of tens of millions of dollars or more to Defendants, all to the damage and detriment of the consuming public.

14.     Defendants have created and still perpetuate a falsehood that SeroVital increases HGH levels in the human body and, by doing so, can provide "anti-aging" benefits when, in fact, the medical community has concluded that it cannot do so,

and is not safe to use. As a result, Defendants' consistent and uniform advertising claims about the Product are false, misleading, and/or likely to deceive consumers, in violation of New Jersey and federal advertising laws.

## JURIDICTION AND VENUE

15.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. Section 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and defendant are citizens of different states. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

16.    Pursuant to 28 U.S.C. Section 1391, this Court is the proper venue for this action because (i) a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District; (ii) Plaintiff is a citizen of New Jersey who resides in Atlantic County, New Jersey; (iii) Defendants made the challenged false representations to Plaintiff in this District; (iv) Plaintiff purchased the Product in this District; and (v) Plaintiff used the Product within this District. Moreover, Defendants receive substantial compensation from sales in this District and made numerous misrepresentations which had a substantial effect in this District,

including, but not limited to, label, packaging, internet, and infomercial advertisements, among other forms of advertising.

17.    Defendants are subject to personal jurisdiction in New Jersey based upon sufficient minimum contacts which exist between Defendants and New Jersey. Defendants are authorized to and are doing business in New Jersey.

## FACTUAL BACKGROUND

### I.    SeroVital Advertising and Label Claims

18.    The Product is sold online, via infomercials, and at retail outlets across New Jersey and the United States.

19.    Every unit of Product sold by Defendants conveys a consistent false and misleading message to consumers—that the Product causes a "682% mean increase in HGH levels," thereby causing "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, [and] heightened sex drive" so as to make "users look and feel decades – not years, but *DECADES* – younger."  These representations are also made on Defendants' official website at www.serovital.com.

20.    Because Defendants represent that the Product will cause a "682% mean increase in HGH levels" and that HGH will provide certain benefits listed on the Product label, consumers reasonably believe that the HGH increase from the Product will cause wrinkle reduction, decrease body fat, increase lean muscle mass,

strengthen bones, improve mood, and heighten sex drive such that they will "look and feel decades – not years, but DECADES – younger"—as claimed on the Product label.

21.     Reasonable consumers are being misled by Defendants' representations because the Product does not cause a "682% mean increase in HGH levels." Defendants also deceive reasonable consumers into believing that the increased HGH levels achieved by the Product will provide the purported benefits of HGH, including wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, [and] heightened sex drive" such that they will look and feel years younger.

22.     The specific false and misleading representations concerning the Product include, but are not limited to, the following:

a.     "Turn back time with the 'anti-aging' breakthrough everyone is talking about!";

b.     "It's clear that Growth Hormone has been associated with wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades—not years, but DECADES – younger";

c.      "682% mean increase in HGH levels";

d.     "Clinically tested";

e.     "Human Growth Hormone Secretagogue";

f.     "Maximum strength formula";

g.   "Peak growth hormone levels associated with: Youthful Skin Integrity* Lean Musculature* Elevated Energy Production* Adipose Tissue Distribution"; and

h.   "Now, after more than 20 years of time-consuming, detailed research, there's finally an affordable oral formula that encourages the pituitary gland to increase growth hormone production naturally, without dangerous drugs or synthetic hormone injections."

## II.   Plaintiff's Experts Confirm That Defendants' Advertising Is False and Misleading

23.   Plaintiff has retained two leading experts in the areas of endocrinology and growth hormone in connection with the claims made herein: Dr. Melmed and Dr. Madoff.  Attached hereto and incorporated by reference herein as Exhibit 1 is the Declaration of Dr. Melmed ("Melmed Decl."), and attached hereto and incorporated by reference herein as Exhibit 2 is the Declaration of Dr. Madoff ("Madoff Decl.").

24.   Dr. Melmed is a world-renowned endocrinologist and national expert in the field of growth hormone and heads the largest pituitary department in the nation at Cedars Sinai Medical Center in Los Angeles, California, where he also serves as the Dean of the Medial Faculty, Executive Vice President, Chief Academic Officer and Director of Research Institute.  Dr. Melmed is also a Professor of Medicine and Associate Dean at the University of California at Los Angeles.  Dr. Melmed has more than 350 peer-reviewed publications for his

research in the area of growth hormone/pituitary gland; has authored over 20 text books and over 130 book chapters on growth hormone/pituitary gland; has won a myriad of awards for work in his field; and has lectured on the topics of growth hormone, pituitary issues and endocrinology at countless seminars, workshops, and symposiums around the globe.  *See* Melmed Decl., Ex. A ("Melmed CV").

25.    Dr. Madoff is a clinical endocrinologist, having been in full-time endocrine practice since 1989.  He is an Assistant Professor of Medicine at The John Hopkins University School of Medicine, where he has been teaching since 1987. Dr. Madoff also serves as the Director at the Woodholme Center for Diabetes and Endocrine Disorders in Pikesville, Maryland.  Dr. Madoff's internship and residency in Internal Medicine and fellowship in Endocrinology and Metabolism took place at John Hopkins Hospital in Baltimore, Maryland.  Dr. Madoff's clinical training and years of patient care in the field of endocrinology provide him with a high level of expertise in the area of growth hormone.  *See* Madoff Decl., Ex. A ("Madoff CV").

26.    Dr. Melmed and Dr. Madoff were each tasked with determining: (a) whether SeroVital can increase HGH by 682%; and (b) whether SeroVital is associated with wrinkle reduction, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades younger, as advertised by Defendants.   *See* Melmed Decl., Ex. B ("Melmed Report"); Madoff Decl., Ex. B ("Madoff Report").

27.    Based on the relevant, peer-reviewed scientific literature and research on growth hormone, their extensive personal and clinical research experience working in the field of endocrinology and growth hormone, and their careful reviews of all information available regarding SeroVital, including the Product packaging, website, infomercial, excerpts from purported studies, and U.S. patents, Dr. Melmed and Dr. Madoff have each concluded that the Product cannot increase HGH levels by 682%, nor can the Product lead to the anti-aging benefits claimed by Defendants, including, wrinkle reduction, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades younger. *See* Melmed Report at pp. 1-2, 9-12; *see also* Madoff Report at pp. 7-11, 14-16.

28.    Dr. Melmed and Dr. Madoff have each further concluded that were SeroVital to work as advertised, i.e., raise HGH by 682%, it would subject users to significant adverse health risks.  *See* Melmed Report at pp. 2, 6-8; Madoff Report at p. 16.

### A.    False Advertising Claim #1: Increased HGH Levels

29.    The Product contains five amino acids and one herb.  Each capsule contains:

- 374.83 mg L-lysine
- 181.38 mg L-arginine
- 0.25 mg L-glutamine
- 170.93 mg L-pyroglutamic acid (oxy-proline)

- 0.25 mg N-acetyl L-cysteine
- 0.125 mg Schizonepta (aerial parts) powder

30.    Oral amino acids, including those contained in the SeroVital formulation, cannot sustain increased HGH levels.  *See* Melmed Report at p. 9.

31.    The literature for orally administered amino acids shows no consistent effects on HGH levels, and none have reported clinical benefits.  *Id.*

32.    Most published clinical studies regarding the effects of oral amino acids show no significant HGH increase, some show flat and other actually show HGH suppression.  *See* Melmed Report at p. 9, Table 3.  In the few studies when HGH has been reported to rise, it is transient, short-lived, very modest in magnitude, and, most importantly, required greater amounts of oral amino acids than are contained in the SeroVital formulation.

33.    None of the ingredients in the Product—neither individually, nor as formulated—can increase HGH levels in the human body.  In fact:

a. The only active ingredient in the Product is L-arginine. The amount of L-arginine contained in the Product (181 mg per capsule) is *so low,* even at the recommended four capsule dosage, it would have no effect on HGH levels at all.  *See* Melmed Report at p. 9 ¶ 1.  Lowest oral amino acid doses reported to transiently increase GH in all the heterogenous studies are 3 to 9 grams daily.  *Id.*  The Product contains 10- to 100-fold lower concentrations of effective oral doses.  *Id.*  The

Product's low doses are proven to have no effect on HGH.  *Id*.  Even if a healthy individual were to ingest four capsules of SeroVital, the amount of active amino acid ingredient, particularly L-arginine, would still be below three grams – the lowest minimal dose required for any effect at all.  *See* Melmed Report, Table 3 [any dosage under three grams has been shown in all published studies to have <u>no effect</u> on HGH]

b.  <u>Lysine and L-Arginine</u>: The amount of L-lysine and L-arginine in the Product cannot increase HGH levels in the body.  *See* Ex. 1: Melmed Report at p. 9, Table 3; s*ee also* Isidori, A., *et al*., *A study of growth hormone release in man after oral administration of amino acids.* CURR. MED. RES. OPIN. 1981; 7(7):475-81; Corpas, E. *et, al*., *Oral arginine-lysine does not increase growth hormone or insulin-like growth factor in old men.* J. GERONTOL. 1993 Jul; 48(4):M128-33; da Silva *et al*., *Hormonal response to L-arginine supplementation in physically active individuals.* Food Nutr Res. 2014 Mar. 25;58; Fayh AP, *et al*., *Effect of L-arginine supplementation on secretion of growth hormone and insulin like growth factor in adults.* ARG. BRAS. ENDOCRINOL. METABOL. 2007 June; 51(4): 587-92; Forbes SC, *et al*., *Oral L-arginine before resistance exercise blunts growth hormone in strength trained males*. INT. J. SPORT NUTR. EXERC. METAB. 2014 Apr; 24(2):236-44.

c.  <u>Glutamine</u>: The amount of glutamine in the Product cannot increase HGH levels in the body.  The Product contains one mg of glutamine in the recommended four capsule dosage.  To the extent glutamine has been found to increase HGH levels, it requires two grams of glutamine, dissolved in a liquid, to do so.  *See,* Welbourne TC, *Increased plasma*

bicarbonate and growth hormone after oral glutamine load. AM. J.
CLIN. NUTR. 1995 May; 61(5):1058-61.

d. <u>Oxy-proline</u>: Studies have shown that oxy-proline decreases the non-
enzymatic antioxidant defenses in the brain and causes reactive species
production and protein oxidation. See Pederzolli CD, et al., Acute
administration of 5-oxoproline induces oxidative damage to lipids and
proteins and impairs antioxidant defenses in cerebral cortex and
cerebellum of young rats. METAB. BRAIN DIS. 2010 June; 25(2):145-54.

e. <u>N-acetyl L-cysteine</u>: No causal link to increased HGH levels in the
body.

f. <u>Schizonepta</u>: No association to increased HGH levels in the body.

**B.    False Advertising Claim #2: Anti-Aging Benefits**

34.    Defendants claim: "It's clear that Growth Hormone has been associated
with wrinkle reduction, decreased body fat, increased lean muscle mass, stronger
bones, improved mood, heightened sex drive, and making users look and feel
decades – not years, but *DECADES* – younger" and further claim the Product can
produce these results.

35.    Human growth hormone is *not* associated with "increased sex drive,
reduced wrinkles, increased bone strength, less fat or leaner muscles" in individuals
with normal functioning pituitary glands.  *See* Melmed Report at p, 12; Madoff
Report at p. 14, ¶¶ 2.4.1, 2.4.2, 2.4.3, 2.4.4; *see also* Toogood, A.A., *et al.*, 1997,
*Preservation of growth hormone pulsality despite pituitary pathology, surgery, and*

*irradiation*, J. Clin. Endocrinol. Metab. 82(7):2215.  No dose of oral amino acids, or even injectable growth hormone would "reverse" any related clinical conditions because there is no association to begin with.  *See* Melmed Report at p. 12.

36.    The Product is incapable of reducing wrinkles, decreasing body fat, increasing lean muscle mass, strengthening bones, improving mood, heightening sex drive, or making users look and feel decades younger.  *See* Melmed Report at p, 12; Madoff Report at p. 14, ¶¶ 2.4.1, 2.4.2, 2.4.3, 2.4.4

37.    The only clinical study which found any causal link between HGH and lean body mass benefits involved synthetic injections administered for 6 months on men over the age of 60.  Rudman, Daniel, M.D., *et al*., *Effects of Human Growth Hormone in Men over 60 Years Old*, N. Eng. J. Med. 1990:323:1-6 (July 5, 1990). The study has since been debunked by the scientific community given that the subjects were not blinded and most of the stated "results" were not actually tested.

38.    In 1996, researchers at University of New Jersey at San Francisco, the Department of Veterans Affairs Medical Center, and the San Francisco Medical Center concluded in a randomized, controlled, double-blind clinical trial that HGH does not increase strength, systemic endurance, or cognitive function. Papadakis, Maxine A., M.D., *et al*., *Growth Hormone Replacement in Healthy Older Men Improves Body Composition but Not Functional Ability*, ANNALS INT. MED., 1996:124:8 (Apr. 15, 1996).

39.    In 2002, researchers for the National Institute of Health and Johns Hopkins University Medical School evaluated the effects of HGH on body composition, strength, and endurance in a 26-week randomized, double-blind, placebo-controlled study and concluded that HGH cannot arrest the aging process and, in fact, caused serious side effects in over 40% of participants who used HGH. Blackman MR, *et al.*, *Growth hormone and sex steroid administration in healthy aged women and men: a randomized controlled trial*. JAMA 2002; 288(18):2282-92 (Nov. 13, 2002).

40.    In 2010, researchers at John Hopkins University School of Medicine concluded that levels of HGH do not positively or negatively affect aging or lifespan. Salvatori, R., M.D., *et al.*, *Congenital HGH deficiency has no effect on normal lifespan*, J. CLIN. ENDOCRIN. & MET. (Jan. 2010).

41.    In a comprehensive meta-analysis of 11 placebo-controlled trials involving 254 healthy participants, growth hormone showed an increase in free fatty acid levels and no change in muscle strength or exercise capacity.  Melmed, Shlomo, M.D., *Pathogenesis and Diagnosis of Growth Hormone Deficiency in Adults*, N. ENGL. J. MED. 380(26):2558-2559 (June 2019).

42.    Even the United States Federal Trade Commission ("FTC") has concluded there exists no reliable evidence to support the claim that natural supplement-based oral products like the Product have the same effects as

prescription HGH, which is always given by injection.  The FTC has further stated that it is not aware of any competent or reliable scientific evidence to support claims that pills and sprays increase a body's HGH levels and provide anti-aging benefits. Accordingly, since 2005, the FTC has sent warning letters to more than 90 internet operators that are selling alleged HGH enhancers for anti-aging benefits. *See* https://www.consumer.ftc.gov/articles/0118-anti-aging-products.

43.     In fact, excess growth hormones can facilitate neoplastic (cancer cell) initiation and progression.  Excess growth hormones can also inhibit tumor suppressors, thereby contributing to a proliferative microenvironment sustaining abnormalities such as colon polyps.  A recent meta-analysis of 23 studies showed a standardized incidence ratio of 1.5 for cancer in patients with acromegaly; i.e., those whose pituitary glands produce too much HGH.   Melmed, Shlomo, M.D., *Pathogenesis and Diagnosis of Growth Hormone Deficiency in Adults*, N. ENGL. J. MED. 380(26):2551-2560 (June 2019).

44.     Current medical guidelines do not recommend growth hormone as an antiaging therapy because it can have unacceptable adverse effects in otherwise healthy persons with normal pituitary function. *Id.* at 2560.

45.     Incredibly, upon information and belief, Defendants have sold tens of millions of dollars' (or more) worth of the Product to New Jersey consumers based upon the false promises and misleading advertisements described herein.

### III.  Defendants' Own Study Supports the Conclusion That SeroVital Is No Different from A Placebo

46.    On its website, Defendants cherry-pick information from a self-funded double-blind, placebo-controlled study in an attempt to counter the mountain of evidence and scientific consensus that the Product cannot deliver the advertised benefits.  For example, although the SeroVital U.S. Patent indicates the original study included 12 males and four females, the abstract on the website and packaging discusses results only from the 12 males.  *See* Madoff Report at ¶¶ 2.2.  In another example, the unlabeled figure on SanMedica's website is not consistent with Defendants' description of the data.  *Id.*  And the claim that SeroVital leads to a 682% Mean Increase in HGH Levels "is based on a single value of HGH 15 minutes before and a single value of HGH two hours after the administration of Serovital, even though there were two GH levels assessed before and five GH levels assessed following Serovital ingestion."  *Id.*

47.    In fact, Defendants' study suggests that there is no difference between SeroVital and a placebo.  AUC values provided in the abstract on the SeroVital website suggest that there is actually no difference in effect between placebo and SeroVital on subsequent HGH levels.  *See* Madoff Report at p. 10, ¶ 2.2.2.5. The probability of increased HGH after ingestion of SeroVital is similar to a placebo (20.4 vs 19.67).  *See* Melmed Report at p. 11, ¶ 2(d)*;* Madoff Report at p. 10, ¶

2.2.2.5. Given the overlapping co-efficient of variation (19.9-20.5 and 18.7-20.6), it is not possible to ascribe a statistically significant difference to these values. *Id.*

48.     Defendants are able to avoid the conclusion that the study demonstrates no statistically significant difference in overall levels over two hours compared to a placebo, because it was not published in a peer-reviewed journal. As Dr. Madoff explains, "[w]hen a study is accepted for publication in a high-quality journal, all of the background materials, methods, and conclusions are rigorously reviewed by qualified fellow scientists." Here, to the contrary, there is no rigorous, detailed description of the patients, procedures, and methods in SeroVital's abstract or patent. *See* Madoff Report at ¶ 2.2.2.1. Instead, Defendants' abstract is confusing and contains contradictions and unlabeled figures that are impossible to interpret. *Id.* at ¶ 2.2.2.5.

49.     Additionally, the purported increase shown by the study is so low and transient that it cannot support growth hormone bioactivity. In that regard, Defendants claim their purported study shows an increase of HGH from .017 to 1.33 ng/ml at two hours. This is so low that it is undetectable by most assays. *See* Melmed Report at p. 11, ¶ 2(a). In addition, it is insufficient to increase liver IGF-I levels, which is vital, as IGF-I is the target growth factor for HGH. *Id.* at p. 11, ¶ 2(b). Absent evidence for increased IGF-I levels, any transient mild HGH increase will have no clinical impact. *Id.*

## CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action on behalf of herself and a class (the "Class")

of:

>  All persons who purchased the Product in the State of New Jersey, for
> personal use and not for resale, during the time period of six years prior
> to the filing of the Complaint, through the present.  Excluded from the
> Class are Defendants' officers, directors, and employees, and any
> individual who received remuneration from Defendants in connection
> with that individual's use or endorsement of the Product.

51.     The Class is so numerous that individual joinder herein is
impracticable. On information and belief, members of the Class number in the
thousands throughout New Jersey.  The precise number of Class members and their
identities is unknown to Plaintiff at this time but may be determined through
discovery.  Class members may be notified of the pendency of this action by mail
and/or publication through the records of Defendants and third-party retailers and
vendors.

52.     Common questions of law and fact exist as to all Class members and
predominate over questions affecting only individual Class members.  Common
legal and factual questions include, but are not limited to:

a.      Whether Defendants' conduct as set forth herein constitutes the
act, use or employment of an unconscionable commercial practice, deceptive, fraud,
false pretense, false promise, misrepresentation or the knowing concealment,

suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in violation of New Jersey Consumer Fraud Act;

       b.    Whether Defendants breached an express warranty made to Plaintiff and the Class;

       c.    Whether Defendants' Product is efficacious, effective, and useful for causing "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles";

       d.    Whether Plaintiff and the Class suffered an ascertainable loss as a result of Defendants' misrepresentations; and

       e.    Whether Plaintiff and the Class are entitled to restitution and/or other monetary relief and, if so, the amount and nature of such relief.

53.    Plaintiff's claims are typical of the claims of the Class, and Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained competent counsel that is experienced in class action and other complex litigation.

54.    Plaintiff and the Class have suffered an ascertainable loss and have lost money as a result of Defendants' false representations.  Plaintiff purchased the Product because of the claims by Defendants that the Product would provide the various anti-aging benefits described herein as a result of increased HGH levels.

Plaintiff relied on Defendants' representations and would not have purchased the Product if she had known that the advertising as described herein was false.

55.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable or impossible for Class members to prosecute their claims individually.

56.     The trial and litigation of Plaintiff's claims are manageable.  Individual litigation of the legal and factual issues raised by Defendants' conduct would increase delay and expense to all parties and the court system.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

57.     Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

58.     Absent a class action, Defendants will likely retain the benefits of their wrongdoing.  Because of the small size of the individual Class members' claims,

few, if any, Class members could afford to seek legal redress for the wrongs complained of herein.   Absent a representative action, the Class members will continue to suffer losses and Defendants will be allowed to continue these violations of law and retain the proceeds of their ill-gotten gains.

**COUNT ONE**
**Violation of New Jersey Consumer Fraud Act**
**N.J.S.A. § 56:8-1, *et seq.***

59.   Plaintiff repeats and realleges the allegations of the previous paragraphs and incorporates the same as if set forth herein at length.

60.   This cause of action is brought pursuant to New Jersey Statute Annotated Section 56:8-1, *et seq.*, the New Jersey Consumer Fraud Act ("CFA"), on behalf of a Class consisting of "All persons who purchased the Product in the State of New Jersey for personal use and not for resale during the time period of six years prior to the filing of the Complaint through the present.  Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Product."

61.   The CFA, N.J.S.A. § 56:8-2, deems "…[a]ny unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or

omission, in connection with the sale or advertisement of any merchandise …

whether or not any person has in fact been misled, deceived or damaged thereby …

is declared to be an unlawful practice…"

62.     In violation of the CFA, Defendant has affirmatively misrepresented

material facts with the intent that consumers rely upon such concealment and

deception in connection with the efficacy and advertised benefits of the Product.

63.     If a person suffers "any ascertainable loss of moneys or property, real

or personal, as a result of the use or employment by another person of any method,

act, or practice declared unlawful" under the CFA, that person "may bring an action

. . . therefor in any court of competent jurisdiction" for "legal or equitable relief"

"sustained by any person in interest," pursuant to N.J.S.A. § 56:8-19.

64.     The practices described herein, specifically Defendants' labeling,

advertising, and sale of the Product, were intended to and did result in the sale of

the Product to the consuming public and violated and continue to violate the CFA

by (1) engaging in an unlawful practice using deceptive representations in

connection with the Product; (2) resulting in an ascertainable loss to Plaintiff and

the  Class; and (3) the unlawful conduct creating the ascertainable loss.

65.     Defendants' conduct, as set forth above, constitutes unfair, fraudulent

and/or deceptive trade practices prohibited under the CFA.

66.     Defendants fraudulently deceived Plaintiff and the Class, and

intentionally misrepresented and concealed material facts from Plaintiff and the Class. Said misrepresentations and concealment were done with the intention of deceiving Plaintiff and the Class and depriving them of their legal rights and money.

67.     Defendants knew or should have known, through the exercise of reasonable care, that the Product does not cause the benefits and results contained in their advertisements.

68.     Defendants' actions as described herein were done with conscious disregard of Plaintiff's rights and Defendants were wanton and malicious in their concealment of the same.

69.     Defendants' advertising of the Product was a material factor in Plaintiff's and the Class's decisions to purchase the Product, as it concerns the ability of the Product to cause anti-aging benefits and increased HGH levels. Defendants' marketing and packaging materials were intended to, and did, induce Plaintiff and members of the Class to rely upon Defendants' representations that the Product would provide anti-aging benefits and increased HGH levels. These representations were a substantial factor in causing Plaintiff and the Class members to purchase the Product.

70.     Based on Defendants' advertising of the Product, Plaintiff and the Class reasonably believed they would receive increased HGH levels and anti-aging benefits.

71.    At the time that Plaintiff and Class members purchased the Product, they were unaware of the fact that the Product was not effective for its intended uses and was, in fact, no more effective than a placebo.

72.    Had they known that Defendants were making misrepresentations about the Product's ability to cause elevated HGH levels and anti-aging benefits, Plaintiff and the Class would not have purchased the Product.

73.    Plaintiff and the Class have suffered ascertainable loss and have lost money as a result of Defendants' false representations.

## COUNT TWO
### Breach of Express Warranty
### N.J.S.A. § 12A:2-313, *et seq.*

74.    Plaintiff repeats and realleges the allegations of the previous paragraphs and incorporates the same as if set forth herein at length.

75.    This cause of action is brought on behalf of a Class consisting of "All persons who purchased the Product in the State of New Jersey for personal use and not for resale during the time six years prior to the filing of this Complaint, through the present.  Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Product."

76.    Defendants expressly warranted that the Product causes "Youthful Skin Integrity* Lean Musculature* Elevated Energy Production* Adipose Tissue

Distribution," "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." The express warranties made by Defendants were a part of the basis for Plaintiff and the Class members' purchase of the Product.

77.     Defendants breached this warranty because the Product does not cause youthful skin integrity, lean musculature, elevated energy, adipose tissue distribution, decreased body fat, increased lean muscle mass, heightened sex drive, improved mood, or decreased wrinkles.

78.     Plaintiff and the Class were injured as a direct result of Defendants' breach because (a) they would not have purchased the Product if they had known the true facts; (b) they paid a premium due to the mislabeling of the Product; and (c) the Product did not have the quality, effectiveness, or value as promised.

## <u>NOTCE TO ATTORNEY GENERAL</u>

A copy of this Complaint will be mailed to the Attorney General of the State of New Jersey within 10 days of filing pursuant to N.J.S.A. §56:8-20.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of herself and on behalf of the members of the Class defined herein, prays for judgment and relief on all causes of action as follows:

A.     For an order certifying the Class, appointing Plaintiff as representative, and designating Plaintiff's counsel as counsel for the Class;

B.     For all forms of relief set forth above;

C.     For damages against Defendants in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum rate allowable by law on any amounts awarded;

D.     For restitution and/or disgorgement in an amount to be determined at trial;

E.     For an order enjoining Defendants from pursuing the policies, acts, and practices complained of herein;

F.     For punitive damages;

G.     For pre-judgment interest from the date of filing this suit;

H.     For reasonable attorneys' fees and costs; and

I.     For such other and further relief as the Court may deem necessary or appropriate.


DATED: November 13, 2019       **SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**

/s/ James C. Shah_____
James C. Shah
475 White Horse Pike
Collingswood, NJ 08107

Telephone: (856) 858-1770
Facsimile: (866) 300-7367
jshah@sfmslaw.com


**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson
Shireen M. Clarkson
Celine Cohan
9255 Sunset Blvd., Suite 804
Los Angeles, CA 90069
Telephone: (213) 788-4050
Facsimile: (213) 788-4070
rclarkson@clarksonlawfirm.com
sclarkson@clarksonlawfirm.com
ccohan@clarksonlawfirm.com

**TYCKO & ZAVAREEI, LLP**
Annick M. Persinger
apersigner@tzlegal.com
483 Ninth Street, Suite 200
Oakland, CA 94607
Telephone: (510) 254-6808
apersigner@tzlegal.com


*Attorneys for Plaintiff Holly Deibler and the Putative Class*