# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOLLY DEIBLER, EDWARD LENHART, AND DIANE LENHART, Individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>BASIC RESEARCH, LLC, BR COS, LLC, BASIC RESEARCH HOLDINGS, LLC, BASIC RESEARCH INTERMEDIATE, LLC, SIERRA RESEARCH GROUP, LLC, MAJESTIC MEDIA, LLC, CRM SPECIALISTS, LLC, BYDEX MANAGEMENT, LLC, SANMEDICA INTERNATIONAL, LLC, LIMITLESS WORLDWIDE, LLC, NOVEX BIOTECH, L.L.C., BODEE GAY, GINA DAINES, HALEY BLACKETT, KIMM HUMPRIES, MITCHELL K. FRIEDLANDER,<br><br>                    Defendants. | Civil Action No.: 1:19-cv-20155 NLH-JS<br><br>Hon. Noel L. Hillman, U.S.D.J.<br>Hon. Joel Schneider, U.S.M.J. |

## FIRST AMENDED COMPLAINT

James C. Shah (SBN 260435)
Nathan C. Zipperian (SBN 06872006)
MILLER SHAH LLP
475 White Horse Pike
Collingswood, NJ 08107
Telephone: (856) 858-1770
Facsimile: (866) 300-7367
jcshah@millershah.com
nczipperian@millershah.com

Ryan J. Clarkson (*pro hac vice*)
Shireen M. Clarkson (*pro hac vice*)
Katherine A. Bruce (*pro hac vice*)
Yana A. Hart (*pro hac vice*)
Kelsey J. Elling (*pro hac vice*)
CLARKSON LAW FIRM, P.C.

Annick M. Persinger (*pro hac vice*)
TYCKO & ZAVAREEI LLP
10880 Wilshire Blvd., Suite 1101
Los Angeles, CA 90024
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
apersinger@tzlegal.com

Katherine M. Aizpuru (*pro hac vice*)
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
kaizpuru@tzlegal.com

22525 Pacific Cost Highway
Malibu, CA 90265
Telephone: (213) 788-4050
Facsimile: (213) 788-4070
rclarkson@clarkssonlawfirm.com
sclarkson@clarksonlawfirm.com
kbruce@clarksonlawfirm.com
yhart@clarksonlawfirm.com
kelling@clarksonlawfirm.com

Plaintiffs, Holly Deibler, Edward Lenhart, and Diane Lenhart (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, brings this First Amended Complaint against SanMedica International, LLC ("SanMedica"), Basic Research, LLC, BR Cos, LLC, Basic Research Holdings, LLC, Basic Research Intermediate, LLC (collectively "Basic Research"), Sierra Research Group, LLC ("Sierra Research"), Majestic Media, LLC, ("Majestic Media"), CRM Specialists, LLC ("CRM Specialists"), Bydex Management, LLC ("Bydex"), Limitless Worldwide, LLC ("Limitless Worldwide"), Novex Biotech, L.L.C. ("Novex Biotech"), Bodee Gay, Gina Daines, Haley Blackett, Kimm Humphries, and Mitchell K. Friedlander (the "Individual Defendants") (collectively "Defendants"). Plaintiffs make the allegations herein upon personal knowledge as to themselves and their own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by their attorneys and their retained experts, pursuant to Federal Rule of Civil Procedure 15(a)(2).

/ / /

## I.    SUMMARY OF THE ACTION

1.    The Individual Defendants use a web of so-called "affiliates" they maintain under the umbrella of Defendant Basic Research to peddle fake medicine that they claim will increase human growth hormone (or "HGH") and therefore reverse the signs of aging. Defendants' operation of its numerous "affiliated" companies is a nationwide racketeering scheme designed to defraud consumers and enrich the Individual Defendants and their company, Defendant Basic Research.

2.    Defendants' fraudulent enterprise is a family business. In 1992, Dennis Gay founded Basic Research, began the creation of Basic Research affiliates, and partnered with Defendant Friedlander to market and sell fraudulent dietary supplements. Now Dennis Gay's children, Defendants Bodee Gay, Gina Daines, Haley Blackett, and Kimm Humphreys operate the enterprise that Dennis Gay built to continue the fraudulent sale of the Products that Friedlander "invented," including SeroVital-hgh ("SeroVital"), Thrive-hGh ("Thrive"), SeroDyne, and Growth Factor 9 ("GF-9") (collectively "the Products").

3.    Today Basic Research touts itself as a "multimillion-dollar company and one of the top distributers in the weight-loss, bodybuilding, anti-aging, joint health, and skin-care industries." One of the ways that Basic Research has been able to grow into a "top distributer" of dietary supplements is through its continued practice of marketing, advertising, and selling products under the names of numerous companies. This business practice is intended to confuse competitors and consumers by creating a complex web of organizations that, according to the late Dennis Gay was orchestrated to "protect our brands in the Wild West atmosphere that exists today in the supplement industry."

4.    Defendants use their complicated web of affiliates to hide that Defendant Basic Research and the Individual Defendants are in fact behind this scheme (1) to flood the market with the idea that oral amino acids can provide anti-aging benefits,

and (2) to avoid liability for the fraudulent sale of the Products. Indeed, Defendants' web of affiliates is so complicated that Defendant Gina Daines was not even sure which of the affiliates she owned, or which she worked for—even though the web of Defendants was originally owned by her father, and Defendants designated her as the person most knowledgeable about the marketing of SeroVital.

5.      All of the Products at issue are the same formula of oral amino acids sold under different names by Defendants. To avoid liability for their false advertising and to saturate the market with the idea that oral amino acids like the Products can provide an anti-aging miracle, Defendants create a public appearance that each of the Products is independent from the other. Defendants represent that each Product is sold by a different phony company—SeroVital by SanMedica, Thrive and SeroDyne by Limitless, and GF-9 by Novex Biotech. But none of these phony companies is a separate business. Instead, they are the Individual Defendants' and Defendant Basic Research's "brands" that are controlled and operated by the Individual Defendants and Basic Research.

6.      Defendants also use these affiliates to spread their money and ownership across entities to avoid being held liable to consumers for fraud. Defendant Basic Research, together with the Individual Defendants, creates a new limited liability company for each dietary supplement they manufacture, advertise, and sell to consumers. In this case, Basic Research and the Individual Defendants created Defendant SanMedica, Defendant Limitless, and Defendant Novex Biotech for the sole purpose of serving as a conduit for the nationwide sale of SeroVital, Thrive, SeroDyne, and GF-9, respectively.

7.      Defendants make it appear that their poster girl for their so-called "science," Amy Heaton, works for an independent organization, Sierra Research. But Defendants created Sierra Research for the sole purpose of adding scientific legitimacy to its Products. Although she is Chief Scientific Officer of Sierra Research, Amy

Heaton actually works for Defendant Basic Research, and is paid by Defendant Bydex Management just like all of Defendant Basic Research's other employees. Defendants also have Amy Heaton hold herself out as "Chief Scientific Officer" for more than one of its brands, including, but not limited to, Defendant SanMedica, the Basic Research Brand that sells SeroVital, and Limitless Worldwide, the Basic Research brand that sells Thrive and SeroDyne.

8.    Defendants use the same misrepresentations about the Products' benefits and the same misleading information about their double-blind placebo-controlled study to market all of the Products. The Individual Defendants and Defendant Basic Research claim that SeroVital, GF-9, and Thrive increase HGH by 682%—which according to SeroVital's and Thrive's packaging and website, can cause "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, [and] heightened sex drive" so as to make "users look and feel decades – not years, but *DECADES* – younger." Similarly, GF-9 falsely promises its consumers a "more youthful, stronger, and active body." And SeroDyne claims that it "complements your body's natural production of this pituitary peptide" aka HGH to improve endurance, metabolic rate, energy, and sleep efficiency.

9.    Defendants also know that, for consumers, "the science is an important reason to believe" and therefore the company aggressively promotes the exact same so-called "science" to sell each of the Products. But, as Plaintiff's experts have opined and testified, Defendants' double-blind placebo-controlled study on their anti-aging formula shows just the opposite of Defendants' claims—that the Products are no better than a placebo.

10.    In fact, the Products provide consumers with nothing more than a false promise. The scientific community confirms: (1) the Products cannot increase HGH levels whatsoever, let alone by 682%; (2) the Products do not reduce wrinkles, "decrease[] body fat," "increase[] lean muscle mass," strengthen bones, "improve[]

mood," "heighten[] sex drive," or make "users look and fees decades … younger" because the oral administration of amino acids like the Products do not increase growth hormone bioactivity; (3) there is no causal link between increased HGH levels and most of the claimed uses, including wrinkle reduction, increased lean muscle mass, stronger bones, improved mood, [or] heightened sex drive; and (4) if the Products were to increase HGH levels as claimed, it would cause significant health risks.

11.     The Products do not increase serum GH levels. As Plaintiffs' expert Dr. Melmed, M.D. confirms, peer-reviewed scientific publications reveal that low dose *oral* amino acids like SeroVital do not induce GH levels. Indeed, Defendants' advertising is false and misleading because, as Dr. Melmed explains, "the oral ingestion of SeroVital is not significantly different from a placebo." Another expert, Dr. H. Madoff, M.D., Ph.D. reached the same conclusion based on Defendants' own study—that there is "no statistically significant difference in total GH levels over the two hours (AUC) following SeroVital compared to placebo treatment." Thus, based on peer-reviewed scientific publications, Defendants study, and expert testimony, Defendants' claim that the Products increase HGH by 682% is provably false and misleading.[1]

12.     Although Defendant claims that the Products increase HGH, and that increases of HGH "decrease[] body fat," "increase[] lean muscle mass," strengthen bones, "improve[] mood," "heighten[] sex drive," or make "users look and feel decades … younger," as Plaintiffs' experts and the scientific consensus confirm, the Products do not improve "wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades younger." Dr. Melmed, M.D. confirms that the Products are not associated with these benefits because, based on the scientific consensus regarding oral amino acids as well as the information available regarding SeroVital, oral administration of

---

[1] Although Plaintiffs' experts reviewed the claims and study for SeroVital, the other Products are the same formula as SeroVital and Defendants' advertising relies on the same study that Plaintiffs' experts conclude showed that SeroVital was no different from placebo.

amino acids like those in SeroVital would not increase GH bio-activity after SeroVital ingestion. Accordingly, based on scientific consensus and expert testimony, Defendants' claim that HGH, which it claims the Products drastically increase, causes weight-loss and anti-aging benefits is provably false and misleading.

13.    In short, the Products are no more effective for its advertised purposes than a placebo, and are therefore worthless to New Jersey consumers who, upon information and belief, have collectively expended tens of millions of dollars or more on the Products during the proposed four-year class period.

## II.    **PARTIES**

### A.    **Plaintiff Holly Deibler**

14.    Plaintiff Deibler is, and at all times relevant hereto was, a citizen of New Jersey residing in Atlantic County. Throughout 2015, Plaintiff viewed television and print advertisements for SeroVital. In or around January 2016, Plaintiff called the phone number she viewed on the television advertisements and placed an order for SeroVital directly with SanMedica over the phone. Plaintiff purchases 18 boxes of SerVital ($99 per box) for a total discounted price of approximately $1,300, with each box containing a 30-day supply of the Product. Plaintiff purchased the Product in reliance upon the Product's advertised ability to increase HGH levels and provide Plaintiff with "decreased body fat," "increased lean muscle mass," a heightened sex drive," an "improved mood," to "look and feel decades younger" and to "decrease[] wrinkles," as set forth in the television, print, and label advertisements for SeroVital. Based on Defendants' claim that the Product increases HGH levels, Ms. Deibler reasonably believed that the increase in HGH levels purportedly caused by the Product would achieve the purported benefits of HGH listed on the label, including "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims to mean that SeroVital would increase HGH

levels by 682%, and that, as a result of that increase, Ms. Deibler would receive the claimed anti-aging benefits.

15.     Ms. Deibler received the boxes of SeroVital in or around January 2016 and used SeroVital as directed. However, as a result, Ms. Deibler did not receive any of the advertised HGH increasing or anti-aging benefits. Ms. Deibler's body fat, muscle mass, sex drive, mood, and skin remained unchanged. Moreover, Plaintiff—in no way, shape, or form—looked or felt younger, let alone by years or decades, as Defendants promised. Had Plaintiff known that SeroVital would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises made were misleading and false, she should not have purchased the Product. As it turned out, Plaintiff received zero benefits from the Product, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

16.     If the Products functioned as advertised, Ms. Deibler would purchase SeroVital or the Products in the future. Because Plaintiffs would like to purchase the Products again and achieve the advertised benefits, she might purchase it again in the future—despite the fact that it was once marred by false advertising or labeling—as she may reasonably, but incorrectly, assume that SeroVital was improved either under the SeroVital brand name or under any of the other substantially similar Products consisting of the same formula. In that regard, Plaintiff is an average consumer who is not sophisticated in the bioavailability or effects of HGH in different formulations, so she is at risk of reasonably, but incorrectly, assuming that Defendants fixed the formulation of the Products or that different products were developed using an entirely different brand or company name. Moreover, as set forth herein, Defendants have rebranded the same formulation of the SeroVital under several new brands, intentionally selling each as if it is being sold by a different and independent company, a pattern they have used with other fraudulent products. Thus, Defendants could

rebrand SeroVital and sell it under a purportedly new company. As Plaintiff continues to desire to buy products that provide anti-aging and similar benefits, Plaintiff could be misled or confused when the Defendants make a new iteration of the product under a new brand name that appears to be sold by a new company.

**B.   Plaintiff Edward Lenhart**

17.    Plaintiff Edward Lenhart is, and at all times relevant hereto, was a citizen of New Jersey residing in Salem County. From approximately 2016-2019, Edward Lenhart regularly purchased and used SeroVital and Growth Factor-9. Plaintiff Edward Lenhart initially purchased and used two boxes of SeroVital, and, for the remaining months he purchased and used Growth Factor-9. Each of his purchases was for a one-month supply, totaling approximately 36 boxes. Plaintiff Edward Lenhart purchased the SeroVital at the Ulta retail stores located in Cherry Hill and Vineland, New Jersey. for approximately $99 per box of a 1-month supply and used a 20% off coupon. Plaintiff Edward Lenhart purchased the Growth Factor-9 at GNC Retail Stores located in Pennsville and Cherry Hill, New Jersey and online through GNC for approximately $70 per box for a 1-month supply. Plaintiff purchased the Products in reliance upon the Products advertised ability to increase HGH levels and provide Plaintiff with "decreased body fat," "increased lean muscle mass," a heightened sex drive," an "improved mood," to "look and feel decades younger" and to "decrease[] wrinkles," as set forth in the television, print, and label advertisements for SeroVital and Growth Factor 9. Based on Defendants' claim that the Products increase HGH levels, Mr. Lenhart reasonably believed that the increase in HGH levels purportedly caused by the Products would achieve the purported benefits of HGH listed on the label, including "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims to mean that the Products

would increase HGH levels by 682%, and that, as a result of that increase, Mr. Lenhart would receive the claimed anti-aging benefits.

18.     Mr. Lenhart used the Products as directed; however, as a result, Mr. Lenhart did not receive any of the advertised HGH increasing or anti-aging benefits. Mr. Lenhart's body fat, muscle mass, sex drive, mood, and skin remained unchanged. Moreover, Plaintiff—in no way, shape, or form—looked or felt younger, let alone by years or decades, as Defendants promised. Had Plaintiff known that SeroVital would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises made were misleading and false, he should not have purchased the Product. As it turned out, Plaintiff received zero benefits from the Product, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

19.     If the Products functioned as advertised, Mr. Lenhart would purchase the Products in the future. Because Plaintiff would like to purchase the Products again and achieve the advertised benefits, he might purchase it again in the future—despite the fact that it was once marred by false advertising or labeling—as he may reasonably, but incorrectly, assume that the Products were improved either under the Products' brand name or under any of the other substantially similar Products consisting of the same formula. In that regard, Plaintiff is an average consumer who is not sophisticated in the bioavailability or effects of HGH in different formulations, so he is at risk of reasonably, but incorrectly, assuming that Defendants fixed the formulation of the Products or that different products were developed using an entirely different brand or company name. Moreover, as set forth herein, Defendants have rebranded the same formulation of the SeroVital under several new brands, intentionally selling each as if it is being sold by a different and independent company, a pattern they have used with other fraudulent products. Thus, Defendants could rebrand SeroVital and sell it under a purportedly

new company. As Plaintiff continues to desire to buy products that provide anti-aging and similar benefits, Plaintiff could be misled or confused when the Defendants make a new iteration of the product under a new brand name that appears to be sold by a new company.

**C.    Plaintiff Diane Lenhart**

20.    Plaintiff Diane Lenhart is, and at all times relevant hereto, was a citizen of New Jersey residing in Salem County. From approximately 2016-2019, Diane Lenhart regularly purchased and used SeroVital and Growth Factor-9. For the first year, Plaintiff Diane Lenhart purchased and used SeroVital. In the second year, Plaintiff Diane Lenhart purchased and used Growth Factor-9. In the third year, Plaintiff Diane Lenhart purchased and used SeroVita and Growth Factor-9, in differing months. Plaintiff purchased the SeroVital at the Ulta retail stores located in Cherry Hill and Vineland, New Jersey for approximately $99 per box of a 1-month supply and used a 20% off coupon at times. Plaintiff purchased the Growth Factor-9 at GNC Retail Stores located in Pennsville and Cherry Hill, New Jersey and online through GNC for approximately $70 per box for a 1-month supply. Plaintiff purchased the Products in reliance upon the Products advertised ability to increase HGH levels and provide Plaintiff with "decreased body fat," "increased lean muscle mass," a heightened sex drive," an "improved mood," to "look and feel decades younger" and to "decrease[] wrinkles," as set forth in the television, print, and label advertisements for SeroVital and Growth Factor 9. Based on Defendants' claim that the Products increase HGH levels, Mrs. Lenhart reasonably believed that the increase in HGH levels purportedly caused by the Products would achieve the purported benefits of HGH listed on the label, including "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." Like other reasonable consumers, Plaintiff interpreted the challenged advertising and labeling claims to mean that the Products

would increase HGH levels by 682%, and that, as a result of that increase, Mrs. Lenhart would receive the claimed anti-aging benefits.

21.     Mrs. Lenhart used the Products as directed; however, as a result, Mrs. Lenhart did not receive any of the advertised HGH increasing or anti-aging benefits. Mrs. Lenhart's body fat, muscle mass, sex drive, mood, and skin remained unchanged. Moreover, Plaintiff—in no way, shape, or form—looked or felt younger, let alone by years or decades, as Defendants promised. Had Plaintiff known that SeroVital would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises would not deliver the advertised HGH increasing and anti-aging benefits, and that the promises made were misleading and false, she should not have purchased the Product. As it turned out, Plaintiff received zero benefits from the Product, and is therefore entitled to, *inter alia*, restitution damages in an amount to be determined at trial.

22.     If the Products functioned as advertised, Mrs. Lenhart would purchase the Products in the future. Because Plaintiff would like to purchase the Products again and achieve the advertised benefits, she might purchase it again in the future—despite the fact that it was once marred by false advertising or labeling—as he may reasonably, but incorrectly, assume that the Products were improved either under the Products' brand name or under any of the other substantially similar Products consisting of the same formula. In that regard, Plaintiff is an average consumer who is not sophisticated in the bioavailability or effects of HGH in different formulations, so he is at risk of reasonably, but incorrectly, assuming that Defendants fixed the formulation of the Products or that different products were developed using an entirely different brand or company name. Moreover, as set forth herein, Defendants have rebranded the same formulation of the SeroVital under several new brands, intentionally selling each as if it is being sold by a different and independent company, a pattern they have used with other fraudulent products. Thus, Defendants could rebrand SeroVital and sell it under

a purportedly new company. As Plaintiff continues to desire to buy products that provide anti-aging and similar benefits, Plaintiff could be misled or confused when the Defendants make a new iteration of the product under a new brand name that appears to be sold by a new company.

### D.   Basic Research Enterprise

23.    The Basic Research Enterprise is a joint enterprise, joint venture, conspiracy, partnership, and organization comprised of multiple affiliated entities and individuals who are also the alter-egos of each other, including, but not necessarily limited to, the Defendants identified below.  The Basic Research Enterprise splits its operation amongst companies to research and develop, manufacture, market, advertise, distribute, and sell consumers scores of different cosmetics, nutritional supplements, and dietary supplements, such as the Products, under the names of nearly a dozen limited liability companies that are all wholly owned subsidiaries within the Basic Research Enterprise, including those identified below.

     a.     **Grandparent/Parent:** Defendant Basic Research Holdings, LLC ("**BR Holdings**") is a Delaware limited liability company headquartered in Dover, Delaware. It maintains its principal place of business and otherwise entirely operates out of 5742 West Harold Gatty Drive, Salt Lake City, Utah 84116 ("BR Headquarters").  At all relevant times, BR Cos and/or BR Holdings have operated as holding companies that either jointly or successively owned, directly or indirectly, all affiliated entities within the Basic Research Enterprise, including those identified below.

     b.     **Parent:** Defendant Basic Research Intermediate, LLC ("**BR Intermediate**") is a Delaware limited liability company

headquartered in Dover, Delaware. It maintains its principal place of business and otherwise entirely operates out of the BR Headquarters. At various relevant times, BR Cos and/or BR Holdings have held ownership of all affiliated entities within the Basic Research Enterprise, including those identified below, indirectly through BR Intermediate.

c.   **Grandparent/Parent:** Defendant BR Cos, LLC ("**BR Cos**") is a Delaware limited liability company headquartered in Dover, Delaware. It maintains its principal place of business and otherwise entirely operates out of the BR Headquarters. At all relevant times, BR Cos and/or BR Holdings have operated as holding companies that either jointly or successively owned, directly or indirectly, all affiliated entities within the Basic Research Enterprise, including those identified below. [2]

d.   **Distribution:** Defendant Basic Research LLC ("**BR**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, BR has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; BR has operated as the distribution division of the Basic Research Enterprise; and, thereby, BR has distributed the Products for the Basic Research Enterprise.

---

[2] Defendant SanMedica's Corporate Disclosure Statement lists Basic Research Intermediate, LLC as its parent corporation and Basic Research Holdings, LLC as its grandparent corporation. *See* Dkt. 4. However, as of September 15, 2020, both entities' status as expired and voluntarily withdrawn on Utah's Division of Corporations and Commercial Code website. During a 30(b)(6) deposition in September 2020 in related case *Pizana v. SanMedica International, LLC*, Case No. 1:18-cv-00644-DAD-SKO, it was also revealed for the first time that BR Cos, LLC acquired Basic Research Intermediate, LLC at some unknown point in time and that BR Cos, LLC was the new umbrella company for several entities.  BR Cos, LLC, however, was only incorporated in the State of Delaware on December 23, 2019, and registered with the State of Utah on February 2, 2020, both of which followed the filing of this action.

e.    **Research & Development:** Defendant Sierra Research Group, LLC ("**Sierra**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, Sierra has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; Sierra has operated as the research and development division of the Basic Research Enterprise; and, thereby, Sierra has researched and developed the Products for the Basic Research Enterprise.

f.    **Marketing & Advertising:** Defendant Majestic Media, LLC ("**Majestic**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, Majestic has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; Majestic has operated as the marketing and advertising division of the Basic Research Enterprise; and, thereby, Majestic has marketed and advertised the Products for the Basic Research Enterprise.

g.    **Sales & Customer Service:** Defendant CRM Specialists, LLC ("**CRM**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, CRM has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; CRM has operated as the sales and customer service division of the Basic Research Enterprise; and, thereby, CRM has sold and serviced customers for the Products for the Basic Research Enterprise.

h.  **Human Resources & Employment:** Defendant Bydex Management, LLC ("**Bydex**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, Bydex has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; Bydex has operated as the human resources and employment division of the Basic Research Enterprise; and, thereby, Bydex has provided employees to staff each of the affiliated companies within the Basic Research Enterprise in order to distribute, research and develop, market and advertise, sell, and service customers for the Products and the Basic Research Enterprise.

i.  **SeroVital:** Defendant SanMedica International, LLC ("**SanMedica**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, SanMedica has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate. At all relevant times, SanMedica has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; SanMedica has operated as the manufacturer of SeroVital for the Basic Research Enterprise; and, thereby, SanMedica has manufactured SeroVital for the Basic Research Enterprise. SanMedica, at all relevant times, has approved, authorized, ratified the conduct of all other affiliated Basic Research Enterprise entities and individuals' wrongful activities alleged herein with respect to the research and

development, manufacture, marketing, advertising, distribution, and sale of SeroVital.

j.  **Thrive and SeroDyne:** Defendant Limitless Worldwide, LLC ("**Limitless**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, Limitless has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; Limitless has operated as the manufacturer of Thrive and SeroDyne for the Basic Research Enterprise; and, thereby, Limitless has manufactured Thrive and SeroDyne for the Basic Research Enterprise. Limitless, at all relevant times, has approved, authorized, ratified the conduct of all other affiliated Basic Research Enterprise entities and individuals' wrongful activities alleged herein with respect to the research and development, manufacture, marketing, advertising, distribution, and sale of Thrive and SeroDyne.

k.  **GF-9:** Defendant Novex Biotech, LLC ("**Novex**"), a Utah limited liability company, is headquartered at, maintains a principal place of business at, and otherwise entirely operates out of the BR Headquarters. At all relevant times, Novex has been a wholly owned subsidiary of BR Cos, BR Holdings, and/or BR Intermediate; Novex has operated as the manufacturer of GF-9 for the Basic Research Enterprise; and, thereby, Novex has manufactured GF-9 for the Basic Research Enterprise. Novex, at all relevant times, has approved, authorized, ratified the conduct of all other affiliated Basic Research Enterprise entities and individuals' wrongful activities alleged herein with respect to the

research and development, manufacture, marketing, advertising, distribution, and sale of GF-9.

l. **Owner/Executive Officer:** Defendant Bodee Gay ("**Bodee Gay**") is a natural person who resides in the State of Utah and operates the Basic Research Enterprise out of the BR Headquarters. At all relevant times prior to 2016, Bodee Gay was the vice president of sales for the Basic Research Enterprise and directly participated in the design, implementation, and audit of sales strategies for the Basic Research Enterprise affiliated companies for the various Products, including SanMedica sales of SeroVital, Limitless sales of Thrive and SeroDyne, and Novex Biotech sales of GF-9. Beginning in or around 2016, Bodee Gay became the Chief Executive Officer for the Basic Research Enterprise and directed, controlled, directly participated in, and has been otherwise responsible for, all aspects of its operations, including the design, implementation, and audit of strategies for the research and development, marketing and advertisement, distribution, sales, customer service divisions, and manufacture of the Products as well as the operation of SanMedica, Limitless, and Nova. Beginning in 2018, Bodee Gay became an owner of the Basic Research Enterprise. As an owner and/or executive officer, Bodee Gay has had final decision-making authority over the foregoing aspects of Basic Research Enterprise's operations.

m. **Owner/Executive Officer:** Defendant Gina Daines ("**Daines**") is a natural person who resides in the State of Utah and operates the Basic Research Enterprise out of the BR Headquarters. At all relevant times, Daines has been the Chief Marketing Officer for the

Basic Research Enterprise and directed, controlled, directly participated in, and has been otherwise responsible for, all aspects of its marketing and advertising operations, including the design, implementation, and audit of strategies for marketing and advertising the Products. Beginning in 2018, Daines became an owner of the Basic Research Enterprise. As an owner and/or executive officer, Daines has had final decision making authority over the foregoing aspects of Basic Research Enterprise's operations.

n.   **Owner/Executive Officer:** Defendant Mitchell Friedlander ("**Friedlander**"), is a natural person who resides in the State of Utah and operates the Basic Research Enterprise out of the BR Headquarters. At all relevant times, Friedlander has been an executive officer and owner of the Basic Research Enterprise and directed, controlled, directly participated in, and has been otherwise responsible for, all aspects of its marketing and advertising operations, including the design, implementation, and audit of strategies for marketing and advertising the Products. As an owner and/or executive officer, Friedlander has had final decision making authority over the foregoing aspects of Basic Research Enterprise's operations.

o.   **Defendants/Basic Research Enterprise.** The foregoing entities and individuals are herein collectively referred to as "Defendants" and the "Basic Research Enterprise."

24.   **New Jersey Contacts.** The Basic Research Enterprise, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of New Jersey. Indeed, the Basic Research

Enterprise deliberately and intentionally has sold hundreds of millions of dollars' worth of the Products to hundreds of thousands of New Jersey consumers. Because New Jersey has a high number of consumers, it is a primary recipient of Defendants' advertising, and accordingly, Defendants have each worked to ensure that prospective purchasers in New Jersey are targets of their deceptive marketing techniques. Defendants also worked with a statistical analysis consulting firm in California that co-authored their self-funded study. Defendants also attempt to create the appearance of scientific legitimacy by attending conferences in California to present various abstracts. For example, Defendants' employee, Amy Heaton, attended a conference in San Francisco California in 2013 to present a mechanism of action study. Defendants also planned to send Amy Heaton to attend a conference in San Diego to present an abstract on a Canine study on SeroVital that was canceled following the COVD-19 pandemic. Additionally, one of Defendants' studies was conducted in Los Angeles, California. Further, Defendants respond to inquiries from California consumers over email.

25.     **Respondeat Superior/Vicarious Liability**. At all relevant times mentioned herein, Defendants were the agents, principals, employees, employers, servants, masters, partners, parents, subsidiaries, successors, predecessors, and joint venturers of each other. In doing the things hereafter alleged, Defendants were acting within the course and scope of such agency, employment, partnership, joint venture, and/or other said legal relationship, and with the consent, authority, ratification, approval, and/or permission of each of the other.

26.     **Aiding & Abetting.** At all relevant times, each Defendant aided and abetted each other Defendant. Each Defendant knowingly gave substantial assistance to each other Defendant who performed the wrongful conduct alleged herein. Accordingly, each Defendant is jointly and severally liable for the damages proximately caused by each other Defendant's wrongful conduct.

27.     **Conspiracy.** At all relevant times, each Defendant was the co-conspirator of each other Defendant, and, therefore, each Defendant is jointly and severally liable for the damages sustained as a proximate result of each other Defendant. Each Defendant entered into an express or implied agreement with each of the other Defendant to commit the wrongs herein alleged. Each Defendant was aware that the other Defendants planned to commit the wrongful acts alleged herein and each Defendant agreed with each other Defendant and intended that the wrongful act be committed. Each Defendant cooperated with each other Defendant to engage in the wrongful conduct.

28.     **Joint Venture.** At all relevant times, each Defendant was a member of the joint venture that is the Basic Research Enterprise. Each Defendant combined its, his, her, or their property, skill, and/or knowledge with the intent to carry out a single business undertaking to sell cosmetics, nutritional supplements, and dietary supplements, including the Products. Each Defendant had an ownership interest in the Business Research Enterprise. Each Defendant had joint control over the Business Research Enterprise, even if they agreed to delegate control. Each Defendant agreed to share the profits and losses of the Basic Research Enterprise.

29.     **Partnership.** At all relevant times, each Defendant was in a partnership with each other Defendant whereby they agreed to share the profits and losses of the Basic Research Enterprise.

### A.     Defendant Bodee Gay

30.     Defendant Bodee Gay is the brother of Defendants Daines, Humphreys, and Blackett, and the son of the now-deceased founder and former owner and chief executive officer of the Basic Research Enterprise (Dennis Gay).

31.     Defendant Bodee Gay, as an executive officer and owner of the Basic Research Enterprise, is personally responsible for the design, content, approval, distribution of all product advertisements, including the specific advertisements viewed

and relied upon by Plaintiffs and Class members, as alleged herein. Within the Defendants' business enterprise, Bodee Gay is the person ultimately responsible for placing the advertisements for the Products, into the stream of commerce and for selling the products in interstate commerce. Bodee Gay makes the final decision on both the content of advertising and the final decision on product pricing. Additionally, Bodee Gay has deliberately confused consumers as to the source of various products, including SeroVital, Thrive, SeroDyne and GF-9 that Defendants (including Bodee Gay) manufacture, market, advertise, promote, distribute, and sell. His intentional tortious acts and personal participation in the wrongful conduct underlying this action deprive him of any protection he might otherwise have for his personal liability under the corporate shield doctrine, or otherwise.

32.     In connection with the manufacturing, marketing, advertising, promotion, distribution and sale of the Products, Defendant Bodee Gay has exercised complete dominion and control over the Basic Research Enterprise such that these companies are his alter ego, a sham, façade, and mere instrumentality for his personal benefit, and he has disregarded and abused the corporate form and structure of these companies.

33.     Defendant Bodee Gay has misused the corporate form of the Basic Research Enterprise entities to commit an intentional fraud upon the public, in an effort to defeat the ends of justice and otherwise evade the law, including with response to the manufacture, marketing, advertisement, promotion, distribution and sale of the Products.

34.     In addition, Defendant Bodee Gay has fraudulently created trademarks and the above-mentioned multiple corporations in order to evade detection of his true identity as the individual with dominion and control, also in order to defeat the ends of justice and otherwise evade the law, including with respect to the marketing, advertising, promotion, distribution, and sale of the Products.

### B.    Defendant Gina Daines

35.    Defendant Daines is the sister of Defendants Bodee Gay, Humphreys, and Blackett, and the daughter of the now-deceased founder and former owner and chief executive officer of the Basic Research Enterprise (Dennis Gay).

36.    Defendant Daines, as the Chief Marketing Officer and owner of the Basic Research Enterprise, is personally responsible for the design, content, approval, distribution of all product advertisements, including the specific advertisements viewed and relied upon by Plaintiffs and Class members, as alleged herein. Within the Defendants' business enterprise, Daines is responsible for placing the advertisements for the Products into the stream of commerce and for selling the Products in interstate commerce. Daines makes the final decision on both the content of advertising and the final decision on product pricing. Additionally, Daines has deliberately confused consumers as to the source of various products, including SeroVital, Thrive, SeroDyne, and GF-9 that Defendants (including Daines) manufacture, market, advertise, promote, distribute, and sell. Her intentional tortious acts and personal participation in the wrongful conduct underlying this class action deprive her of any protection she might otherwise have for her personal liability under the corporate shield doctrine, or otherwise.

37.    In connection with the manufacturing, marketing, advertising, promotion, distribution and sale of the Products, Defendant Daines has exercised complete dominion and control over the Basic Research Enterprise such that these companies are her alter ego, a sham, façade, and mere instrumentality for her personal benefit, and she has disregarded and abused the corporate form and structure of these companies.

38.    Defendant Daines has misused the corporate form of the Basic Research Enterprise entities to commit an intentional fraud upon the public, in an effort to defeat the ends of justice and otherwise evade the law, including with response to the

manufacture, marketing, advertisement, promotion, distribution and sale of the Products.

39.    In addition, Defendant Daines has fraudulently created trademarks and the above-mentioned multiple corporations in order to evade detection of her true identity as the individual with dominion and control, also in order to defeat the ends of justice and otherwise evade the law, including with respect to the marketing, advertising, promotion, distribution, and sale of the Products.

### C.    Defendant Mitchell Friedlander

40.    Defendant Friedlander as a marketing officer and owner of the Basic Research Enterprise, is directly involved in the invention, development, endorsement, advertising, marketing, and promotion of Basic Research Enterprise products, including the Products.  Friedlander is responsible for the design, content, approval, distribution, and publication of Defendants' advertisements, including SeroVital advertisement viewed by Plaintiffs.

41.    Defendant Friedlander also receives "royalty" payments for each sale of various products marketed by Basic Research pursuant to a royalty agreement and/or covenant not to sue between Friedlander and the Basic Research Enterprise.

42.    Defendant Friedlander is also listed as the "inventor" of the SeroVital formula on each of the 15 patents that have been granted to the SeroVital formula.

43.    Defendant Friedlander is also personally subject to an FTC injunction issued against Defendant Basic Research and Dennis Gay—the father of Defendants Daines, Bodee Gay, Humphreys, and Blackett. The June 19, 2006 FTC injunction prohibits the marketing and sale of weight loss products where Defendant Basic Research Enterprise and Defendant Friedlander were used a similar scheme as the one described herein to sell fraudulent products that do not do what they were advertised to do. In that regard, the FTC injunction prohibited the Basic Research Enterprise and Friedlander from making unsubstantiated claims "directly or through any corporation,

subsidiary, division, or other device" from, among other things, "misrepresent[ing], in any manner, expressly or by implication, including through the use of endorsements or trade names, the existence, contents, validity, results, conclusions, or interpretations of any test, study, or research." The injunction also requires Defendant Friedlander to notify the FTC if he discontinues his current employment, and of his affiliation with any new business or employment for a period of ten years.

44.   Defendant Friedlander has a lengthy record of wrongdoing and violation of federal and state laws. Defendant Friedlander has been the subject of "Cease and Desist" Orders and "False Representation" Orders issued by the U.S. Postal Service in connection with Friedlander's activities concerning the marketing and sale of weight-loss dietary supplements which were falsely advertised as causing weight loss in virtually all users as they were not substantiated by credible scientifically derived evidence.

45.   In connection with the manufacturing, marketing, advertising, promotion, distribution, and sale of the Products, Defendant Friedlander has exercised complete dominion and control over the Basic Research Enterprise such that these companies are his alter ego, a sham, façade, and mere instrumentality for his personal benefit, and he has disregarded and abused the corporate form and structure of these companies.

46.   Defendant Friedlander has misused the corporate form of the Basic Research Enterprise entities to commit an intentional fraud upon the public, in an effort to defeat the ends of justice and otherwise evade the law, including with response to the manufacture, marketing, advertisement, promotion, distribution and sale of the Products.

47.   In addition, Defendant Friedlander has fraudulently created trademarks and the above-mentioned multiple corporations in order to evade detection of his true identity as the individual with dominion and control, also in order to defeat the ends of

justice and otherwise evade the law, including with respect to the marketing, advertising, promotion, distribution, and sale of the Products.

### D.   Defendant Haley Blackett

48.   Defendant Blackett is a citizen and resident of Utah with a place of business located at the BR Headquarters.

49.   Defendant Blackett has worked in marketing at Basic Research and Bydex Management for 18 years and is an owner of Basic Research, as well as other Basic Research "affiliated" companies. Individually or acting in concert with the other Defendants, Blackett formulates, directs, controls, or participates in the acts and/or business practices alleged in this First Amended Complaint. Defendant Daines explained that Blackett worked as the "traffic manager" who "trafficked all the different marketing materials that needed to get completed and made sure they got to different vendors and were reproduced or produced." As an owner of Basic Research, and in her role in marketing, Blackett has final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants.

50.   Defendant Blackett, as an owner of Basic Research is personally responsible for the design, content, approval, distribution of all product advertisements, including the specific advertisements viewed and relied upon by Plaintiffs and Class members, as alleged in this First Amended Complaint. Within the Defendants' business enterprise, Blackett is responsible for placing the advertisements for the Products, into the stream of commerce and for selling the products in interstate commerce. Blackett makes the final decision on both the content of advertising and the final decision on product pricing. Additionally, Blackett has deliberately confused consumers as to the source of various products, including SeroVital, Thrive, and GF-9 that Defendants (including Blackett) manufacture, market, advertise, promote, distribute, and sell. Her intentional tortious acts and personal participation in the wrongful conduct underlying

this class action deprive her of any protection she might otherwise have for her personal liability under the corporate shield doctrine, or otherwise.

### E.    Defendant Kimm Humphreys

51.    Kimm Humphreys is a citizen and resident of Utah with a place of business located at the BR Headquarters.

52.    Defendant Humphreys works in customer service and in marketing purchasing media for Basic Research. Individually or acting in concert with the other Defendants, Humphreys formulates, directs, controls, or participates in the acts and/or business practices alleged in this First Amended Complaint. As an owner of Basic Research, and in her role in marketing, Blackett has final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants.

53.    Defendant Humphreys, as an owner of Basic Research, is personally responsible for the design, content, approval, distribution of all product advertisements, including the specific advertisements viewed and relied upon by Plaintiffs and Class members, as alleged in this First Amended Complaint. Within the Defendants' business enterprise, Humphreys is responsible for placing the advertisements for the Products, into the stream of commerce and for selling the products in interstate commerce. Humphreys makes the final decision on both the content of advertising and the final decision on product pricing. Additionally, Humphreys has deliberately confused consumers as to the source of various products, including SeroVital, Thrive, and GF-9 that Defendants (including Humphreys) manufacture, market, advertise, promote, distribute, and sell. Her intentional tortious acts and personal participation in the wrongful conduct underlying this class action deprive her of any protection she might otherwise have for her personal liability under the corporate shield doctrine, or otherwise.

**M.**     **Defendants Are Co-Conspirators Who Direct Their Conduct at New Jersey Consumers**

54.     Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein each of these individuals and/or entities was the agent, servant, employee, subsidiary, affiliate, partner, assignee, successor-in-interest, alter ego, or other representative of each of the remaining Defendants and was acting in such capacity in doing the things herein complained of and alleged.

55.     In committing the wrongful acts alleged herein, Defendants planned and participated in and furthered a common scheme by means of false, misleading, deceptive, and fraudulent representations to induce members of the public in New Jersey to purchase the Products. Defendants participated in the making of such representations in that they did disseminate or cause to be disseminated said misrepresentations in New Jersey.

56.     Defendants, upon becoming involved with the manufacturing, advertising, and sale of the Products, knew or should have known that the claims about the Products' ability to raise HGH levels and deliver anti-aging benefits were false, deceptive, and misleading. Defendants affirmatively misrepresented the benefits of the Products in order to convince the public and the Products' users in New Jersey to purchase and use the Products, resulting in profits of tens of millions of dollars or more to Defendants, all to the damage and detriment of the consuming public.

57.     Defendants have created and still perpetuate a falsehood that the Products increase HGH levels in the human body and by doing so can provide "anti-aging" benefits when the medical community has concluded that it cannot do so nor is it safe to do so. As a result, Defendants' consistent and uniform advertising claims about the Product are false, misleading, and/or likely to deceive in violation of New Jersey and federal advertising laws.

58.     Defendants' track record of disseminating false and misleading advertisements for dietary supplements is evidenced by the fact that Basic Research and Friedlander are the subject of a permanent injunction entered by the FTC that, among other things, proscribes the marketing and sale of alleged weight loss products through affiliates unless competent and reliable scientific evidence supports the claims made about such products. *In the Matter of Basic Research, L.L.C., A.G. Waterhouse, L.L.C., Klein-Becker USA, L.L.C., Nutrasport, L.L.C., Sovage Dermalogic Laboratories L.L.C., BAN, L.L.C., d/b/a Basic Research, L.L.C., Old Basic Research, L.L.C., Basic Research, A.G. Waterhouse, Klein-Becker USA, Nutra Sport, and Sovage Dermalogic Laboratories, Dennis Gay, Daniel B. Mowrey, d/b/a American Phytotherapy Research Laboratory, and Mitchell K. Friedlander*, FTC Docket No. 9318 (June 19, 2006). There, the FTC brought an enforcement action against Basic Research, Friedlander, and their affiliated network of entities. The myriad entities named in the FTC action illustrates the extent to which Defendants' business model relies on shell companies, affiliates, and confusing corporate structures to perpetrate their fraud. In addition to enjoining Basic Research, Dennis Gay, Daniel B. Mowrey, and Mitchell Friedlander from, among other things, "directly or through any corporation, subsidiary, division, or other device" from manufacturing and advertising products as causing weight or fat loss, the FTC ordered Basic Research to make a three-million-dollar payment to the FTC on behalf of all respondents.

## III.   <u>JURIDICTION AND VENUE</u>

59.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. Section 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and defendant are citizens of different states. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

60.     Pursuant to 28 U.S.C. Section 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District: Plaintiffs are citizens of New Jersey and Plaintiff Deibler resides in this District; Defendants made the challenged false representations to Plaintiff Deibler in this District; Plaintiff Deibler purchased the Product in this District; and Plaintiff Deibler used the Product within this District. Moreover, Defendants receive substantial compensation from sales in this District, and Defendants made numerous misrepresentations which had a substantial effect in this District, including but not limited to, label, packaging, internet, and infomercial advertisements, among other advertising.

61.     Defendants are subject to personal jurisdiction in New Jersey based upon sufficient minimum contacts which exist between Defendants and New Jersey. Defendants are authorized to do and doing business in New Jersey.

## IV.   FACTUAL BACKGROUND

### A.     Defendants Operate Basic Research in Such a Way as to Ensure that Consumers Who Purchase Their "Miracle Pills" Are Defrauded

62.     Defendants Bodee Gay, Gina Daines, Haley Blackett, and Kimm Humphreys inherited the Basic Research family business and their father's partnership with Defendant Friedlander, including the family practice of perpetuating false representations to unsuspecting consumers through misleading advertising and label claims, and operating a complex corporate enterprise to shield it from liability.

63.     Defendants contrived and developed a dietary supplement consisting of a blend of five amino acids and one herb (originally called SeroVital) that Defendants claim can increase HGH levels that then result in an anti-aging miracle.

64.     To confuse and defraud consumers, Defendants chose to market, advertise, and sell the Products under three different names: SeroVital, Thrive, SeroDyne, and GF-9. Additionally, Defendants chose to sell the Products from Utah

to consumers in New Jersey and around the country under three different entities: Defendants SanMedica (to sell SeroVital), Limitless Worldwide (to sell Thrive and SeroDyne), and Novex Biotech (to sell GF-9). Defendants intentionally decided to use three different companies to sell the Products three ways: by marketing the identical products as separate brands being sold by purportedly different companies, Defendants would create the appearance of a robust and competitive market for oral amino acids, which would contribute to the public perception that they are legitimate Products that provide anti-aging benefits and not snake oil being marketed by single fraudster.

65.     As evidence of the similarity of Products, each Product retails for $99 per box.[3]

66.     Most of the Products are sold on entirely different websites, with no apparent reference to one another. Defendants own and control each of these websites and have designed each website to obfuscate the fact that each Product is part of a family of Products sold by the same affiliated group, and Defendants use the websites to disseminate misleading information about the Products over interstate wires, from the BR Headquarters in Utah, to consumers in New Jersey and around the country. Interestingly, on growthfactor9.com, GF-9 is marketed as "the first-and only-dietary supplement clinically shown to naturally increase your own GH levels up to 682%"— even though the original formula was called SeroVital. Similarly, on mylimitlessww.com, Limitless Worldwide markets itself has having "discovered a radical new concept" in Thrive. Limitless Worldwide also sells SeroDyne as a "radical, new, proprietary amino acid compound" on mylimitlessww.com while identifying it as a "SeroVital Complex." And on Serovital.com, SeroVital is marketed as a "revolutionary Renewal Complex."

---

[3] As part of this same scheme, Defendants also sell the SeroVital formula under the brand name Nouriche Fertility. Defendants use the same misleading claims about its study on SeroVital to support its claim that Nouriche Fertility provides anti-aging benefits that promote fertility.

67.     To create the appearance that the Products are backed by legitimate independent research, Defendants decided that Basic Research's own in-house research and development arm should operate under an entirely different name, Defendant Sierra Research, and created a separate entity to further the goals of their conspiracy. But Defendant Sierra Research does not have any employees that do not also work for Basic Research. Instead, Amy Heaton and the other so-called employees of Sierra Research are paid by Defendant Bydex Management like other Basic Research employees.

68.     Defendants, with the help of their employee—Amy Heaton of Defendant Sierra Research—intentionally  misrepresent the significance of Defendants' double-blind placebo-controlled trials on SeroVital. In particular, Defendants tout these trials on labels, and on Product websites to convince reasonable consumers and the general public that there is sound scientific support for their Products, and in particular, that HGH can reverse the sign of aging. The scientific backing is a sham, however, and Defendants know this. Indeed, in rejecting Defendants' analysis of the results of its study, reviewers for one peer-reviewed publication explained that Defendants over emphasized the impact of oral amino acids and that "Baseline hGH in the participants taking placebo was about 500% higher than in the participants taking amino acid supplement. They are unreliable and unexplained data. At the same time the authors state that 'the mean value for hGH was slightly higher [...] the difference was not statistically significant.' Without explaining the reason of such a huge difference (>500%) it is impossible to specify the increase of hGH at 120 minutes (682%). Taking into account that each participant served as their own control, there should not be any difference in baseline hGH." Defendants rely on Dr Heaton's flawed analysis of study data to substantiate its claims for the Products and disseminate this information to consumers via Product labels, websites, Product fact sheets, and emails in response to consumer inquiries from Utah to consumers in New Jersey and around the country

using interstate wires. This study, however, demonstrates the opposite of Defendants' claims because the data shows that the Products are no better than a placebo.

69.     Despite the reality that Defendants' own study shows the opposite of what they claim, Defendants continue to cite their study disseminated over interstate wires, such as on each of the Product websites, Product labels, Product fact sheets, and emails in response to consumers inquiries to support their claims about each of the Products—Products that are also sold under different product and company names. Indeed, for years, Defendants have knowingly engaged in a pattern of omissions and misrepresentations over interstate wires, executed through their deceptive corporate structures, to sell its placebos to consumers in New Jersey and around the country. Defendants' enterprise of affiliates and the sale of the Products are devised to defraud Plaintiffs and Class members.

70.     Defendants have used their various entities as tools or instrumentalities to carry out schemes or artifices to defraud. Defendants' schemes or artifices to defraud Plaintiffs and Class members have consisted of systematic and continuing practices of disseminating through the United States mail and interstate wire facilities false and misleading information via television commercials, Internet websites and postings, point-of-purchase advertisements, national magazine advertisements, and the Products' packaging, intended to coax unsuspecting customers, including Plaintiffs and the members of the Class, into purchasing millions of dollars worth of the Products manufactured, marketed, advertised, and sold by Defendants.

**B.     SeroVital's False and Misleading Advertising and Label Claims**

71.     SeroVital is sold online, via infomercials, and at retail outlets across New Jersey and the United States. Defendants rely on interstate wires to advertise it to consumers and receive revenues from its sale, both directly from consumers and from middleman retailers and distributors that sell SeroVital. Defendants also rely on the

mail to distribute SeroVital from the BR Headquarters in Utah to consumers, distributors, and retailers around the country.

72.     Every unit of SeroVital sold by Defendants conveys a consistent false and misleading message to consumers—that the SeroVital causes a "682% mean increase in HGH levels" and that HGH is "associated with wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, [and] heightened sex drive" so as to make "users look and feel decades – not years, but *DECADES* – younger."

73.     Because Defendants represent that the SeroVital will cause a "682% mean increase in HGH levels," and that HGH will provide certain benefits listed on the label, consumers reasonably believe that the HGH increase from the SeroVital will cause wrinkle reduction, decrease body fat, increase lean muscle mass, strengthen bones, improve mood, and heighten sex drive such that they will "look and feel decades – not years, but DECADES – younger"—as claimed on the label.  A true and correct representation of the SeroVital's front label is shown below.



74.     Reasonable consumers are misled by Defendants' representations because SeroVital does not cause a "682% mean increase in HGH levels." Defendants also deceive reasonable consumers into believing that the increased HGH levels achieved by the SeroVital will provide the purported benefits of HGH, including wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, [and] heightened sex drive" such that they will look and feel years younger.

75.     From the BR Headquarters in Utah to consumers in New Jersey and around the country, Defendants direct and disseminate false representations about the SeroVital as part of their fraudulent scheme to convince consumers that HGH has anti-aging benefits. The specific false and misleading representations concerning the SeroVital include, but are not limited to, the following:

    a.    "Turn back time with the 'anti-aging' breakthrough everyone is talking about!"

    b.    "It's clear that Growth Hormone has been associated with wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades—not years, but DECADES – younger"

    c.    "682% mean increase in HGH levels"

    d.    "Clinically tested"

    e.    "Human Growth Hormone Secretagogue"

    f.    "Maximum strength formula"

    g.    "Peak growth hormone levels associated with: Youthful Skin Integrity* Lean Musculature* Elevated Energy Production* Adipose Tissue Distribution"

h.   "Now, after more than 20 years of time-consuming, detailed research, there's finally an affordable oral formula that encourages the pituitary gland to increase growth hormone production naturally, without dangerous drugs or synthetic hormone injections."

## C.   The Substantially Similar Products' Misleading Advertising and Label Claims

76.   Defendants' GF-9, Thrive, and SeroDyne products are the same formula as SeroVital and are sold as part of the same racketeering scheme.

77.   Thrive is sold online, via infomercials, and at retail outlets across New Jersey and the United States. As with SeroVital, Defendants rely on interstate wires to advertise GF-9 and Thrive to consumers and receive revenues from their sale, both directly from consumers and from middleman retailers and distributors that sell these Products. Defendants also rely on the mail to distribute these Products from the BR Headquarters in Utah to consumers, distributors, and retailers around the country.

78.   Thrive conveys a consistent false and misleading message to consumers—that ir causes a "mean 8-fold increase in serum growth hormone levels after a single oral serving of the supplement" and that HGH "helps maintain healthy bone strength, increase elastin and reduces wrinkles" and makes users "look and feel decades younger. Not years … DECADES younger"

79.   From the BR Headquarters in Utah to consumers in New Jersey and around the country, Defendants direct and disseminate false representations about Thrive as part of their fraudulent scheme to convince consumers that HGH has anti-aging benefits. The specific false and misleading representations concerning the SeroVital include, but are not limited to, the following:

a.   "Fountain of Youth"

b.   "Look younger"

     c.     "Feel younger:

     d.     "Lose body fat"

     e.     "Increase muscle tone"

     f.     "Have an increased sex drive"

80.    Reasonable consumers are misled by Defendants' representations because the Product does not cause a "mean 8-fold increase in serum growth hormone levels after a single oral serving of the supplement." Defendants also deceive reasonable consumers into believing that the increased HGH levels achieved by the Product will provide the purported benefits of HGH, including wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, and heightened sex drive such that they will look and feel years younger.

81.    SeroDyne is sold online, via infomercials, and at retail outlets across New Jersey and the United States.

82.    SeroDyne conveys a consistent false and misleading message to consumers—that it "complements your body's natural production of this pituitary peptide after a single oral serving of the supplement." Because SeroDyne relies on the same double-blind placebo-controlled study to support its claims, it is apparent that this "pituitary peptide" is a reference to HGH.

83.    From the BR Headquarters in Utah to consumers in New Jersey and around the country, Defendants direct and disseminate false representations about SeroDyne as part of their fraudulent scheme to convince consumers that "this pituitary peptide" has anti-aging benefits. The specific false and misleading representations concerning the Product include, but are not limited to, the following:

     a.  "more energy"

     b.  "less fat"

     c.  "more lean muscle mass"

     d.  "stronger bones"

     e.  "a better sex drive"

     f.  "younger-looking skin"

84.   Reasonable consumers are misled by Defendants' representations because SeroDyne does not "complement[] your body's natural production of this pituitary peptide after a single oral serving of the supplement." Defendants also deceive reasonable consumers into believing that the amino acid compound will "complement production" of a "specific pituitary peptide" and provide the purported benefits of the "pituitary peptide," including increasing lean muscle mass, stronger bones, improved mood, more energy, better mood, and heightened sex drive such that they will look and feel years younger.

85.   GF-9 is sold online, via infomercials, and at retail outlets across New Jersey and the United States.

86.   GF-9 conveys a consistent false and misleading message to consumers—that the product increases GH levels "by up to 682% safely for a more youthful, stronger, and active body."

87.   From the BR Headquarters in Utah to consumers in New Jersey and around the country, Defendants direct and disseminate false representations about GF-9 as part of their fraudulent scheme to convince consumers that HGH has anti-aging benefits. The specific false and misleading representations concerning the product include, but are not limited to, the following:

     a.   "more energy"

     b.   "less fat"

     c.   "Quicker recovery"

     d.   "Improved sleep"

     e.   "More energy"

     f.   "Better mood"

     g.   "Increased sex drive"

88.     Reasonable consumers are misled by Defendants' representations because the SeroVital does not increase GH levels "by up to 682% safely for a more youthful, stronger, and active body." Defendants also deceive reasonable consumers into believing that the increased HGH levels achieved by the Product will provide the purported benefits of HGH, including increase lean muscle mass, stronger bones, improved mood, more energy, better mood, and heightened sex drive such that they will look and feel years younger.

### D.     Plaintiffs' Experts Confirm That Defendants' Advertising Is Provably False and Misleading:

89.     Plaintiffs have retained two leading experts in the areas of endocrinology and growth hormone in connection with the claims made herein: Dr. Shlomo Melmed, M.D. ("Dr. Melmed") and Dr. David H. Madoff, M.D., Ph.D. ("Dr. Madoff"). Attached hereto and incorporated by reference herein as Exhibit 1 is the declaration of Dr. Melmed ("Melmed Decl."). Attached hereto and incorporated by reference herein as Exhibit 2 is the declaration of Dr. Madoff ("Madoff Decl.").

90.     Dr. Melmed is a world-renowned endocrinologist and national expert in the field of growth hormone. Dr. Melmed heads the largest pituitary department in the nation at Cedars Sinai Medical Center in Los Angeles, California where he also serves as the Dean of the Medial Faculty, Executive Vice President, Chief Academic Officer and Director of Research Institute. He is also a Professor of Medicine and Associate Dean at the University of California at Los Angeles. Dr. Melmed has over 350 peer-reviewed publications for his research in the area of growth hormone/pituitary gland; has authored over 20 textbooks and over 130 book chapters on growth hormone/pituitary gland; has won a myriad of awards for work in his field; and has lectured on the topics of growth hormone, pituitary issues and endocrinology at countless seminars, workshops, and symposiums around the globe. He is revered by all in his field. *See*, Melmed Decl., Ex. A ("Melmed CV").

91.     Dr. Madoff is a clinical endocrinologist, having been in full time endocrine practice since 1989.  He is an Assistant Professor of Medicine at The John Hopkins University School of Medicine where he has been teaching since 1987.  He also serves as the Director at the Woodholme Center for Diabetes and Endocrine Disorders in Pikesville, Maryland.  His internship and residency in Internal Medicine and fellowship in Endocrinology and Metabolism were at John Hopkins Hospital in Baltimore, Maryland. His clinical training and years of patient care in the field of endocrinology provide him with a high level of expertise in the area of growth hormone.  *See*, Madoff Decl., Ex. A ("Madoff CV").

92.     Dr. Melmed and Dr. Madoff were each tasked with determining: (a) whether SeroVital can increase HGH by 682%; and (b) whether SeroVital is associated with wrinkle reduction, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades younger, as advertised by Defendants.  *See*, Melmed Decl., Ex. B ("Melmed Report"); Madoff Decl., Ex. B ("Madoff Report").

93.     Based on the relevant peer-reviewed scientific literature and research on growth hormone, their extensive personal and clinical research experience working in the field of endocrinology and growth hormone, and their careful reviews of all information available regarding SeroVital, including the product packaging, website, infomercial, excerpts from purported studies, and U.S. patents, Dr. Melmed and Dr. Madoff each concluded SeroVital (and therefore the Substantially Similar Products) cannot increase HGH levels by 682% nor can the Products lead to the anti-aging benefits claimed by Defendants, including, wrinkle reduction, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades younger. *See,* Melmed Report at pp. 1-2, 9-12; Madoff Report at pp. 7-11, 14-16.

94.     Dr. Melmed and Dr. Madoff each further concluded that were SeroVital (and therefore the Substantially Similar Products) to work as advertised, i.e., raise HGH by 682%, it would subject users to significant adverse health risks.  *See,* Melmed Report at pp. 2, 6-8; Madoff Report at p. 16.

### 1.     False Advertising Claim #1: Increased HGH Levels

95.     Defendants formulated the Products in an identical way, as each Product contains the same five amino acids and one herb. Each capsule of each Product contains:

    a.     374.83 mg L-lysine

    b.     181.38 mg L-arginine

    c.     0.25 mg L-glutamine

    d.     170.93 mg L-pyroglutamic acid (oxy-proline)

    e.     0.25 mg N-acetyl L-cysteine

    f.     0.125 mg Schizonepta (aerial parts) powder

96.     Oral amino acids, including those contained in the Products' formulation, cannot sustain increased HGH levels. *See,* Melmed Report at p. 9.

97.     The literature for orally administered amino acids shows no consistent effects on HGH levels, and none have reported clinical benefits. *Id.*

98.     Most published clinical studies regarding the effects of oral amino acids show no significant HGH increase, some show flat and other actually show HGH suppression. *See,* Melmed Report at p. 9, Table 3. In the few studies when HGH has been reported to rise, it is transient, short-lived, very modest in magnitude, and most importantly, required greater amounts of oral amino acids than are contained in the SeroVital formulation.

99.     None of the ingredients in the Products—neither individually, nor as formulated—can increase HGH levels in the human body.

a.  The only active ingredient in the Products is L-arginine. The amount of L-arginine contained in the Products (181 mg per capsule) is *so low,* even at the recommended 4 capsule dosage, it would have no effect on HGH levels at all. *See,* Melmed Report at p. 9 ¶1. Lowest oral amino acid doses reported to transiently increase GH in all the heterogenous studies are 3 to 9 grams daily. *Id.* The Products contain 10 to 100-fold lower concentrations of effective oral doses. *Id.* The Products' low doses are proven to have no effect on GH. *Id.* Even if a healthy individual would ingest 4 capsules of SeroVital (as well as the Substantially Similar Products), the amount of active amino acid ingredient, particularly arginine, would still be below 3 grams—the lowest minimal dose required for any effect at all. *See,* Melmed Report, Table 3 [any dosage under 3 grams has been shown in all published studies to have <u>no effect</u> on HGH].

b.  <u>Lysine and Arginine</u>: The amount of lysine and arginine in the Products cannot increase HGH levels in the body. *See,* Ex. 1: Melmed Report at p. 9, Table 3; s*ee also,* Isidori, A. *et al., A study of growth hormone release in man after oral administration of amino acids.* CURR. MED. RES. OPIN. 1981; 7(7):475-81; Corpas, E. *et al., Oral arginine-lysine does not increase growth hormone or insulin-like growth factor in old men.* J. GERONTOL. 1993 Jul; 48(4):M128-33; da Silva *et al., Hormonal response to L-arginine supplementation in physically active individuals.* Food Nutr Res. 2014 Mar. 25;58; Fayh AP *et al., Effect of L-arginine supplementation on secretion of growth hormone and insulin like growth factor in adults.* ARG. BRAS. ENDOCRINOL. METABOL. 2007 June; 51(4): 587-92; Forbes SC *et al., Oral L-arginine before resistance exercise blunts*

*growth hormone in strength trained males.* INT. J. SPORT NUTR. EXERC. METAB. 2014 Apr; 24(2):236-44.

c.   Glutamine: The amount of glutamine in the Products cannot increase HGH levels in the body. The Products contains 1 mg of glutamine in the recommended 4 capsule dosage. **To the extent glutamine has been found to increase HGH levels, it requires 2 grams** of glutamine, dissolved in a liquid, to do so. *See,* Welbourne TC, *Increased plasma bicarbonate and growth hormone after oral glutamine load.* AM. J. CLIN. NUTR. 1995 May; 61(5):1058-61.

d.   Oxy-proline: Studies have shown that oxy-proline decreases the non-enzymatic antioxidant defenses in the brain and causes reactive species production and protein oxidation. *See,* Pederzolli CD *et al.*, *Acute administration of 5-oxoproline induces oxidative damage to lipids and proteins and impairs antioxidant defenses in cerebral cortex and cerebellum of young rats.* METAB. BRAIN DIS. 2010 June; 25(2):145-54.

e.   N-acety-cysteine: No causal link to increased HGH levels in the body.

f.   Schizonepeta: No association to increased HGH levels in the body.

**2.    False Advertising Claim #2: Anti-Aging Benefits**

100.   Defendants claim: "It's clear that Growth Hormone has been associated with wrinkle reduction, decreased body fat, increased lean muscle mass, stronger bones, improved mood, heightened sex drive, and making users look and feel decades – not years, but *DECADES* – younger" and further claim the Products can produce these results.

101.   Human growth hormone is *not* associated with "increased sex drive, reduced wrinkles, increased bone strength, less fat or leaner muscles" in individuals with normal functioning pituitary glands. *See,* Melmed Report at p, 12; Madoff Report

at p. 14, ¶¶2.4.1, 2.4.2, 2.4.3, 2.4.4; *see also,* Toogood, A.A. *et. al.*, 1997, *Preservation of growth hormone pulsality despite pituitary pathology, surgery, and irradiation*, J. Clin. Endocrinol. Metab. 82(7):2215. No dose of oral amino acids, or even injectable growth hormone would "reverse" any related clinical conditions because there is no association to begin with. *See,* Melmed Report at p. 12.

102. The Products are incapable of reducing wrinkles, decreasing body fat, increasing lean muscle mass, strengthening bones, improving mood, heightening sex drive, or making users look and feel decades younger. *See,* Melmed Report at p, 12; Madoff Report at p. 14, ¶¶2.4.1, 2.4.2, 2.4.3, 2.4.4.

103. The only clinical study which found any causal link between HGH and lean body mass benefits involved synthetic injections administered for 6 months on men over the age of 60. Rudman, Daniel, M.D., *et al.*, *Effects of Human Growth Hormone in Men over 60 Years Old*, N. Eng. J. Med. 1990:323:1-6 (July 5, 1990). The study has since been debunked by the scientific community given that the subjects were not blinded and most of the stated "results" were not actually tested for.

104. In 1996, researchers at University of California at San Francisco, the Department of Veterans Affairs Medical Center, and the San Francisco Medical Center concluded in a randomized, controlled, double-blind clinical trial that HGH does not increase strength, systemic endurance, or cognitive function. Papadakis, Maxine A., M.D., *et al.*, *Growth Hormone Replacement in Healthy Older Men Improves Body Composition but Not Functional Ability*, ANNALS INT. MED., 1996:124:8 (Apr. 15, 1996).

105. In 2002, researchers for the National Institute of Health and Johns Hopkins University Medical School evaluated the effects of HGH on body composition, strength, and endurance in a 26-week randomized, double-blind, placebo-controlled study and concluded that HGH cannot arrest the aging process and in fact caused serious side effects in over 40% of participants who used HGH. Blackman MR,

*et al.*, *Growth hormone and sex steroid administration in healthy aged women and men: a randomized controlled trial.* JAMA 2002; 288(18):2282-92 (Nov. 13, 2002).

106.    In 2010, researchers at John Hopkins University School of Medicine concluded that levels of HGH do not positively or negatively affect aging or lifespan. Salvatori, R., M.D., *et al.*, *Congenital HGH deficiency has no effect on normal lifespan*, J. CLIN. ENDOCRIN. & MET. (Jan. 2010).

107.    In a comprehensive meta-analysis of 11 placebo-controlled trials involving 254 healthy participants, growth hormone showed an increase in free fatty acid levels and no change in muscle strength or exercise capacity. Melmed, Shlomo, M.D., *Pathogenesis and Diagnosis of Growth Hormone Deficiency in Adults*, N. ENGL. J. MED. 380(26):2558-2559 (June 2019).

108.    Even the United States Federal Trade Commission ("FTC") has concluded there exists no reliable evidence to support the claim that natural supplement-based oral products like the Products have the same effects as prescription HGH, which is always given by injection. The FTC has further stated it is not aware of any competent or reliable scientific evidence to support claims that pills and sprays increase the body's HGH levels and provide anti-aging benefits.  Accordingly, since 2005, the FTC has sent warning letters to more than 90 internet operators that are selling alleged HGH enhancers for anti-aging benefits. *See* https://www.consumer.ftc.gov/articles/0118-anti-aging-products.

109.    In fact, excess growth hormones can facilitate neoplastic (cancer cell) initiation and progression. Excess growth hormones can also inhibit tumor suppressors, thereby contributing to a proliferative microenvironment sustaining abnormalities such as colon polyps. A recent meta-analysis of 23 studies showed a standardized incidence ratio of 1.5 for cancer in patients with acromegaly, i.e., those whose pituitary glands produce too much HGH. Melmed, Shlomo, M.D., *Pathogenesis*

*and Diagnosis of Growth Hormone Deficiency in Adults*, N. ENGL. J. MED. 380(26):2551-2560 (June 2019).

110.    Current medical guidelines do not recommend growth hormone as an antiaging therapy because it can have unacceptable adverse effects in otherwise healthy persons with normal pituitary function. *Id.* at 2560.

111.    Incredibly, upon information and belief, Defendants have sold tens of millions of dollars or more worth of the Products to New Jersey consumers based upon the false promises and misleading advertisements described herein.

E.    **Defendants' Own Study Supports the Conclusion That SeroVital Formula Is No Different from A Placebo**

112.    On their websites for the Products, Defendants cherry-pick information from a self-funded double-blind placebo-controlled study in an attempt to counter the mountain of evidence and scientific consensus that the Products cannot deliver the advertised benefits.[4] For example, although the SeroVital U.S. Patent indicates the original study included 12 males and 4 females, the abstract on the SeroVital website and packaging discusses results only from the 12 males. *See* Madoff Report at ¶¶2.2. In another example, the unlabeled figure on its website is not consistent with their description of the data. *Id.* And the claim that SeroVital leads to a 682% Mean Increase in HGH Levels "is based on a single value of HGH 15 minutes before and a single value of HGH two hours after the administration of Serovital, even though there were two GH levels assessed before and five GH levels assessed following Serovital ingestion." *Id.*

113.    In fact, Defendants' study suggests that there is no difference between the Products and a placebo. AUC values provided in the abstract on the SeroVital website suggest that there is actually no difference in effect between placebo and the SeroVital

---

[4] Each of the Products website refer to the same "placebo-controlled, double-blind study" reviewed and analyzed by Plaintiffs' experts.

formula on subsequent HGH levels. *See* Madoff Report at p. 10, ¶2.2.2.5. The probability of increased HGH after ingestion of the SeroVital formula is similar to a placebo (20.4 vs 19.67). *See,* Melmed Report at p. 11, ¶2(d)*;* Madoff Report at p. 10, ¶2.2.2.5. Given the overlapping co-efficient of variation (19.9-20.5 and 18.7-20.6) it is not possible to ascribe a statistically significant different to these values. *Id.*

114.    Defendants are able to avoid the conclusion that the study demonstrates no statistically significant difference in overall levels over two hours compared to placebo, because it was not published in a peer-reviewed journal. As Dr. Madoff explains, [w]hen a study is accepted for publication in a high-quality journal, all of the background materials, methods, and conclusions are rigorously reviewed by qualified fellow scientists." Here, to the contrary, there is no rigorous detailed description of the patients, procedures, and methods in SeroVital's abstract or Patent. *See* Madoff Report at ¶ 2.2.2.1. Instead, Defendants abstract is confusing, contains contradictions, and contains unlabeled figures that are impossible to interpret. *Id.* at ¶ 2.2.2.5.

115.    Additionally, the purported increase shown by the study is so low and transient such that it could not support growth hormone bioactivity. In that regard, Defendants claim its purported study shows an increase of HGH from .017 to 1.33 ng/ml at 2 hours. This is so low, it is undetectable by most assays. *See,* Melmed Report at p. 11, ¶ 2(a). In addition, it is insufficient to increase liver IGF-I levels, which is vital, as IGF-I is the target growth factor for HGH. *Id.* at p. 11, ¶ 2(b). Absent evidence for increased IGF-I levels, any transient mild HGH increase will have no clinical impact. *Id.*

## V.    CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this action on behalf of herself and a class of "All persons who purchased the Products for personal use and not for resale during the time period of six years prior to the filing of the Complaint, through the present. Excluded from the Class are Defendants' officers, directors, and employees, and any individual who

received remuneration from Defendants in connection with that individual's use or endorsement of the Products."

117.   Plaintiffs also bring this action on behalf of themselves and a subclass of "All persons residing in New Jersey who purchased the Products for personal use and not for resale during the time period of six years prior to the filing of the Complaint, through the present. Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Products."

118.   The Class is so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands throughout New Jersey. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third party retailers and vendors.

119.   Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

a.   Whether Defendants' conduct is in violation of RICO 18 U.S.C. § 1962(a), (c)-(d);

b.   Whether Defendants' conduct as set forth herein constitutes the act, use or employment of an unconscionable commercial practice, deceptive, fraud, false pretense, false promise, misrepresentation or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in violation of New Jersey Consumer Fraud Act;

c. Whether Defendants breached an express warranty made to Plaintiff and the Class;

d. Whether Defendants' Products are efficacious, effective, and useful for causing "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles";

e. Whether Plaintiff and the Class suffered an ascertainable loss as a result of Defendants' misrepresentations; and

f. Whether Plaintiffs and the Class are entitled to restitution, and/or other monetary relief and, if so, the amount and nature of such relief.

120.   Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained competent and experienced counsel in class action and other complex litigation.

121.   Plaintiffs and the Class have suffered injury in fact and have lost money as a result of Defendants' false representations. Plaintiffs purchased SeroVital because of the claims by Defendants that it would provide the various anti-aging benefits described herein as a result of increased HGH levels. Plaintiffs relied on Defendants' representations and would not have purchased SeroVital (or the other Products) if they had known that the advertising as described herein was false.

122.   A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for Class members to prosecute their claims individually.

123.   The trial and litigation of Plaintiffs' claims are manageable. Individual litigation of the legal and factual issues raised by Defendants' conduct would increase

delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

124.   Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

125.   Absent a class action, Defendants will likely retain the benefits of their wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the Class members will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of their ill-gotten gains.

126.   A copy of this Complaint will be mailed to the Attorney General of the State of New Jersey within 10 days of filing pursuant to N.J.S.A. § 56:8-20.

**VI.**

**<u>COUNT ONE</u>**

**Conduct and Participation in a RICO Enterprise Through a Pattern of Racketeering Activity**

**(Violation of Racketeer Influenced and Corrupt Organization Act, codified at 18 U.S.C. § 1962(a), (c)-(d))**

*On Behalf of the Class Against All Defendants*

127.   Plaintiffs repeat and reallege all allegations of the previous paragraphs, and incorporate the same as if set forth herein at length.

128.   Defendants are individuals and/or entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property." The association is composed of Defendants Basic Research, LLC, BR Cos, LLC, Basic Research Holdings, LLC, Basic Research Intermediate, LLC, SanMedica International, LLC, Sierra Research Group, LLC, Limitless Worldwide, LLC, Novex Biotech, LLC, Bydex Management, LLC, Majestic Media, LLC, CRM Specialists, LLC, and Defendants Gay, Daines, Blackett, Humphreys, and Friedlander.

129.   Section 1962(a) makes it:

unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

130.   Section 1962(c) makes it:

unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. §1962(c).

131.   Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(a) and (c) among other provisions. 18 U.S.C. § 1962(d).

132.   Defendants are associated with each other as an enterprise within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).

133.   Beginning before the class period and continuing to this day, Defendants have unlawfully increased their profits by making fraudulent claims that the Products—under the guise of multiple different brand and entity names—increase HGH and provide anti-aging benefits when they do not. The RICO enterprise, which all Defendants have engaged in, and the activities of which affected interstate and foreign commerce, is comprised of an association in fact of persons, including each Defendant and other unnamed co-conspirators. That association in fact was structured by various contracts and non-contractual relationships between the Defendants, by which Defendants assumed different roles in agreeing to carry out a mail and wire fraud scheme to sell the Products under different brands and entities and produce misleading self-funded studies to deceive consumers into thinking the Products provide anti-aging benefits by increasing HGH when, in fact, the Products are no different from a placebo.

134.   The members of the RICO enterprise all share a common purpose: to enrich themselves at Class members' expense by maximizing Defendants' revenues through fraudulent sales of the Products. As set forth herein, Defendants benefitted financially from their scheme to defraud Plaintiffs and the Class members, including by making false representations that the Products would increase HGH and provide anti-aging benefits, and even going so far as to create their own self-funded studies to substantiate such baseless claims to sell the Products, which Defendants would not have done but for the existence of the scheme.

135.   This RICO enterprise has existed for almost 30 years and continues to expand and operate pursuant to agreements entered into between and amongst Defendants and other unnamed co-conspirators. The RICO enterprise has functioned

as a continuing unit and maintains an ascertainable structure separate and distinct from the pattern of racketeering activity.

136.   The enterprise was characterized by Defendants' pattern of false representations and omissions, made by Defendants' marketing and research and development teams to consumers. These false representations and omissions were designed to induce consumers to purchase costly products that are no different than a placebos. This pattern of false representations was disseminated to potential purchasers of the Products in New Jersey and around the country, by Defendants based in Utah and Delaware, under the direction and on behalf of Defendants in Utah. The dissemination typically was done using interstate telephone wires.

137.   The true nature of Defendants' Products was left undisclosed, was omitted, and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits, at least some of which were used to expand the enterprise, causing further injury to Plaintiffs and the Class members.

138.   Defendants profited from the enterprise, and Plaintiffs and the Class members suffered because the enterprise significantly increased the cost of the Products that worked no different than a placebo. Defendants used the proceeds from this scheme to advance the scheme by funding and operating their marketing machine, including through the use of the mails and interstate wires to sell the Products, providing consumers with misrepresentative information, including via email all over interstate wireline communications systems, and obtaining sales revenues via documents and banking transactions that were exchanged via electronic means over interstate wires, thereby growing the enterprise and causing further injury to the members of the Class, as described throughout.

139.   Defendants' scheme was reasonably calculated to deceive Plaintiffs and Class members, all of whom are of ordinary prudence and comprehension, through the execution of their complex and illegal scheme to misrepresent the effectiveness of

worthless placebos. Plaintiffs and Class members would not have purchased the Products but for the illegal racketeering scheme operated by Defendants.

140.   Defendants each had the specific intent to participate in the overall RICO enterprise and the scheme to defraud Plaintiff and the Class, and each participated in the enterprise as follows:

141.   Defendants Basic Research, LLC, BR Cos, LLC, Basic Research Holdings, LLC, and Basic Research Intermediate, LLC (collectively "Basic Research") direct, control, and participate in the activities of the enterprise in a variety of ways as set forth herein, including but not limited to developing, manufacturing, and marketing scores of cosmetics, nutritional supplements, and dietary supplements (including the Products) that are marketed under the names of nearly a dozen limited liability companies that have been formed by Defendants. Throughout the class period, these Defendants oversee shipments of their fraudulently advertised Products from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. In connection with all Defendants, acting from Utah, these Defendants used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities.  Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

142.   Defendant Gay directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using his role as CEO of Basic Research to exercise complete dominion and control over Basic Research, SanMedica, and Sierra Research, such that these companies are his alter ego, a sham, façade, and mere instrumentality for his personal benefit, and he has disregarded and abused the corporate form and structure of these companies, including with response

to the manufacture, marketing, advertisement, promotion, distribution, and sale of the Products. Throughout the class period, Gay oversaw the dissemination of Defendants' fraudulent advertising from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Gay, acting from Utah, used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities. Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

143.     Defendant Daines directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role as owner, former Chief Marketing Officer, and sister of CEO Gay to have final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants. Throughout the class period, Daines oversaw the dissemination of Defendants' fraudulent advertising from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Daines, acting from Utah, used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities. Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

144.     Defendant Blackett directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role in marketing of Bydex, as well as owner and sister of CEO Gay to have final decision-

making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants. Throughout the class period, Blackett oversaw the dissemination of Defendants' fraudulent advertising from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Blackett, acting from Utah, used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities.  Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

145.    Defendant Humphreys directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using her role in marketing purchasing media and customer service, as well as owner and sister of CEO Gay to have final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants. Throughout the class period, Humphreys oversaw the dissemination of Defendants' fraudulent advertising from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Humphreys, acting from Utah, used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities.  Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

146.   Defendant Friedlander directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including using his role as a named inventor and marketing consultant to have final decision-making authority over work carried out in Basic Research's marketing department, which is responsible for the labeling, advertising, and media placement for dietary supplements sold by Defendants. Throughout the class period, Humphreys oversaw the dissemination of Defendants' fraudulent advertising from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Humphreys, acting from Utah, used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities.  Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

147.   Defendant SanMedica International, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including manufacturing, distributing, advertising, and selling SeroVital. Throughout the class period, SanMedica oversaw shipments of their fraudulently advertised Products from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale.

148.   Defendant Sierra Research Group, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including acting as the research and development arm for Basic Research and the Products. Throughout the class period, Sierra Research Group oversaw the dissemination of so-called scientific substantiation from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute,

and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Sierra Research Group used the mail and interstate wires to conduct research in California and to present abstracts and their research to further their goal of saturating the market with the idea that oral amino acids provide an anti-aging miracle.

149.   Defendant Limitless Worldwide, LCC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including manufacturing, distributing, advertising, and selling Thrive and SeroDyne. Throughout the class period, Limitless Worldwide oversaw shipments of their fraudulently advertised Products from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale.

150.   Defendant Novex Biotech, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including manufacturing, distributing, advertising, and selling GF-9. Throughout the class period, Novex Biotech oversaw shipments of their fraudulently advertised Products from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale.

151.   Defendant Bydex Management, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including as a purported leasing company that is listed as the employer on the paychecks of all of Defendant Basic Research's employees. Throughout the class period, Bydex Management oversaw shipments of their fraudulently advertised Products from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading

information described herein as well as to receive profits from the sale. Acting from Utah, Bydex Management used the mail and interstate wires to create and register additional subsidiaries and affiliates in the state of Delaware to further their goals of making it appear that the Products were marketed by different entities. Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

152.   Defendant Majestic Media, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways set forth herein, including the marketing and advertising division of the Basic Research Enterprise. Throughout the class period, Majestic Media marketed and advertised the fraudulently advertised Products from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

153.   Defendant CRM Specialists, LLC directs, controls, and participates in the activities of the enterprise in a variety of ways as set forth herein, including acting as the sales and customer service division of the Basic Research Enterprise. Throughout the class period, CRM Specialists sold and serviced customers for the fraudulently advertised Products from the BR Headquarters in Utah to consumers in New Jersey and around the country, relying on the mail to distribute, and interstate wires to disseminate the misleading information described herein as well as to receive profits from the sale. Each of these acts were undertaken with the knowledge and approval of all other Defendants in furtherance of the goals of their conspiracy.

154.   During the ten (10) years preceding the filing of this action and to the present, all Defendants did cooperate jointly and severally in the commission of three

(3) or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in violation of 18 U.S.C. 1962(d), as described in this First Amended Complaint.

155.   Beginning at an exact date unknown to Plaintiffs, but within ten (10) years preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues to this day.

156.   The acts set below ("Racketeering Acts") had the same pattern and purpose to defraud Plaintiffs and the Class for the benefit of Defendants. Each Racketeering Act involved the same or similar methods of commission and participants and affected the Class similarly.

157.   Without the repeated predicate acts, the ability to conduct their fraud using the mail and telecommunications wires, and the money laundering, Defendants' business would not have succeeded.

158.   The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the enterprise to operate their businesses to fraudulently induce Plaintiffs and the Class to purchase the Products.

159.   Defendants' wrongful conduct has caused injury to Plaintiffs and the Class, remains a part of their ongoing business practices, and remains a continuing threat to Plaintiffs, the Class, and the general public.

160.   Defendants' association with the enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

161.   To further their goals, Defendants, working in concert, engaged in various forms of criminal activity, including mail fraud and wire fraud.

162.   Defendants' ongoing pattern of Defendants' ongoing pattern of racketeering activity has injured and continues to injure Plaintiff and the Class.

Defendants' pattern of mail fraud and wire fraud was the proximate cause of the injuries suffered by Plaintiff and the Class.

> ### A.  Defendants Committed Multiple Acts of Mail Fraud in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise

163.   Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff and the Class out of money, in reliance on the mail. Defendants committed these acts with the intent to defraud Plaintiff and the Class.

164.   Defendants used the mail for the purpose of executing the fraudulent scheme herein.

165.   Specifically, Defendants agreed to each of the acts of mail fraud described throughout this First Amended Complaint. In addition, Defendants agreed to rely on the mail to distribute point-of-purchase advertisements and advertisements published in national print publications to advertise, label, offer for sale, sell, and distribute the Products by falsely claiming that the Products increase HGH and offer a multitude of anti-aging benefits. In such advertisements Defendants also falsely assert that their clinical trial supports such claims.

166.   In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme to defraud, Defendants either individually or in combination with themselves, used and caused to be used the U.S. mail by both placing and causing to be placed letters, marketing and sales materials, advertisements, agreements and other matters in depositories and by removing or causing to be removed letters and other mailable matters from depositories, in violation of the mail fraud statute, 18 U.S.C. § 1341.

167.   Defendants could not have furthered their fraud without the use of the mail. For example, because Defendants sought to advertise in major print publications, they required the mail to distribute misleading advertisements to the various states,

including New Jersey. For these reasons, use of the mail to conduct the fraudulent activity was necessary and inevitable.

**B.    Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise**

168.    Defendants voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff and the Class out of money, in reliance on interstate wires. Defendants committed these acts with the intent to defraud Plaintiff and the Class.

169.    Specifically, Defendants agreed to each of the acts of wire fraud described throughout this First Amended Complaint. In addition, Defendants agreed to rely on interstate wires to disseminate advertisements via search engines and other online platforms to further the goals of the enterprise. Defendants knew that these advertisements were targeted to drive product sales by falsely claiming that the Products increase HGH and offer a multitude of anti-aging benefits. In such advertisements Defendants also falsely assert that their clinical trial supports such claims.

170.    Additionally, Defendants agreed that Defendants should facilitate communications with class members over interstate wires in furtherance of the fraud. Consumers nationwide contacted Defendants via online platforms to inquire about the Products and facilitate purchases.

171.    In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme or artifice to defraud, Defendants either individually or in combination with themselves, used or caused to be used interstate wire communications to transmit or disseminate false, fraudulent, and misleading communications and information, in violation of the wire fraud statute, 18 U.S.C. § 1343. Defendants' use of interstate wire facilities included advertising the Products through television commercials and Internet postings, as well as interstate

telephone calls from Plaintiffs and Class members who were seeking to purchase the product and/or complain about its non-performance.

172.   Defendants could not have furthered their fraud without the ability to use the telecommunications to share information with consumers and retailers nationwide. Because Defendants needed to communicate with consumers and retailers around the country, use of interstate telecommunications wires to conduct the fraudulent activity was necessary and inevitable.

## VII.

## COUNT TWO

### Violation of New Jersey Consumers Fraud Act
### N.J.S.A. § 56:8-1, *et seq.*

*On behalf of the New Jersey Subclass, Against the Basic Research Defendants, or in the alternative, against All Defendants.*

173.   Plaintiffs repeat and reallege all allegations of the previous paragraphs, and incorporate the same as if set forth herein at length.

174.   This cause of action is brought pursuant to New Jersey Statute Annotated Section 56:8-1, *et seq.*, the New Jersey Consumer Fraud Act ("CFA"), on behalf of a Class consisting of "All persons who purchased the Products in the State of New Jersey for personal use and not for resale during the time period of six years prior to the filing of the Complaint through the present. Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Product."

175.   The CFA, N.J.S.A. § 56:8-2, deems "…[a]ny unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that

others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . whether or not any person has in fact been misled, deceived or damaged thereby . . . is declared to be an unlawful practice . . . "

176.   In violation of the CFA, Defendants have affirmatively misrepresented material facts with the intent that consumers rely upon such concealment and deception in connection with the efficacy and advertised benefits of the Product.

177.   If a person suffers "any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful" under the CFA, that person "may bring an action . . . therefor in any court of competent jurisdiction" for "legal or equitable relief" "sustained  by any person in interest," pursuant to N.J.S.A. § **56:8-18**

178.   The practices described herein, specifically Defendants' labeling, advertising, and sale of the Products, were intended to result and did result in the sale of the Products to the consuming public and violated and continue to violate the CFA by (1) engaging in an unlawful practice using deceptive representations in connection with the Product; (2) resulting in an ascertainable loss to Plaintiff and the Class; and (3) the unlawful conduct creating the ascertainable loss.

179.   Defendants' conduct, as set forth above, constitutes unfair, fraudulent and/or deceptive trade practices prohibited under the CFA.

180.   Defendants fraudulently deceived Plaintiff and the Class, and intentionally misrepresented and  concealed material facts from Plaintiff and the Class. Said misrepresentations and concealment were done with the intention of deceiving Plaintiff and the Class and depriving them of their legal rights and money.

181.   Defendants knew or should have known, through the exercise of reasonable care, that the Product does not cause the benefits and results contained in their advertisements.

182.    Defendants' actions as described herein were done with conscious disregard of Plaintiff's rights and Defendants were wanton and malicious in their concealment of the same.

183.    Defendants' advertising of the Product was a material factor in Plaintiff's and the Class's decisions to purchase the Product, as it concerns the ability of the Product to cause anti-aging benefits and increased HGH levels. Defendants' marketing and packaging materials were intended to, and did, induce Plaintiff and members of the Class to rely upon Defendants' representations that the Product would provide anti-aging benefits and increased HGH levels. These representations were a substantial factor in causing Plaintiff and the Class members to purchase the Product.

184.    Based on Defendants' advertising of the Product, Plaintiff and the Class reasonably believed they would receive increased HGH levels and anti-aging benefits.

185.    At the time that Plaintiff and Class members purchased the Product, they were unaware of the fact that the Product was not effective for its intended uses and was, in fact, no more effective than a placebo.

186.    Had they known that Defendants were making misrepresentations about the Product's ability to cause elevated HGH levels and anti-aging benefits, Plaintiff and the Class would not have purchased the Product.

187.    Plaintiff and the Class have suffered ascertainable loss and have lost money as a result of Defendants' false representations.

## VIII.

## <u>COUNT THREE</u>

**Breach of Express Warranty N.J.S.A. § 12A:2-313, *et seq.***

*On behalf of the New Jersey Subclass, Against the Basic Research Defendants, or in the alternative, against All Defendants.*

188.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, and incorporates the same as if set forth herein at length.

189.    This cause of action is brought behalf of a Class consisting of "All persons who purchased the Product in the State of New Jersey for personal use and not for resale during the time six years prior to the filing of this Complaint, through the present. Excluded from the Class are Defendants' officers, directors, and employees, and any individual who received remuneration from Defendants in connection with that individual's use or endorsement of the Product."

190.    Defendants expressly warranted that the Product causes "Youthful Skin Integrity* Lean Musculature* Elevated Energy Production* Adipose Tissue Distribution," "decreased body fat," "increased lean muscle mass," "heightened sex drive," "improved mood," and "decreased wrinkles." The express warranties made by Defendants were a part of the basis for Plaintiff and the Class members' purchase of the Product.

191.    Defendants breached this warranty because the Product does not cause youthful skin integrity, lean musculature, elevated energy, adipose tissue distribution, decreased body fat, increased lean muscle mass, heightened sex drive, improved mood, or decreased wrinkles.

192.    Plaintiff and the Class were injured as a direct result of Defendants' breach because (a) they would not have purchased the Product if they had known the true facts; (b) they paid a premium due to the mislabeling of the Product; and (c) the Product did not have the quality, effectiveness, or value as promised.

## IX.    PRAYER FOR RELIEF

193.    WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the members of the Class and New Jersey Subclass defined herein, prays for judgment and relief on all Causes of Action as follows:

a.   For an order certifying the Class, appointing Plaintiff as representative, and designating Plaintiffs' counsel as counsel for the Class and New Jersey Subclass;

b.   For all forms of relief set forth above;

c.   For damages against Defendants in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum rate allowable by law on any amounts awarded;

d.   For restitution and/or disgorgement in an amount to be determined at trial;

e.   For treble damages under the New Jersey Consumer Fraud Act (codified at N.J.S.A. § 56:8-19);

f.   For an order enjoining Defendants from pursuing the policies, acts, and practices complained of herein;

g.   For punitive damages;

h.   For pre-judgment interested from the date of filing this suit;

i.   For reasonable attorneys' fees and costs; and

j.   For such other and further relief as the Court may deem necessary or appropriate.

Dated: November 10, 2021                Respectfully submitted,

/s/James C. Shah
James C. Shah (SBN 260435)
Nathan C. Zipperian (SBN 006872006)
MILLER SHAH LLP
475 White Horse Pike
Collingswood, NJ 08107
Telephone: (856) 858-1770
Facsimile: (866) 300-7367
jcshah@millershah.com

nczipperian@millershah.com

Ryan J. Clarkson (*pro hac vice*)
Shireen M. Clarkson (*pro hac vice*)
Katherine A. Bruce (*pro hac vice*)
Yana A. Hart (*pro hac vice*)
Kelsey J. Elling (*pro hac vice*)
CLARKSON LAW FIRM, P.C.
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050
Facsimile: (213) 788-4070
rclarkson@clarksonlawfirm.com
sclarkson@clarksonlawfirm.com
kbruce@clarksonlawfirm.com
yhart@clarksonlawfirm.com
kelling@clarksonlawfirm.com


Annick M. Persinger (*pro hac vice*)
TYCKO & ZAVAREEI LLP
10880 Wilshire Blvd., Suite 1101
Los Angeles, CA 90024
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
apersinger@tzlegal.com

Katherine M. Aizpuru (*pro hac vice*)
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
kaizpuru@tzlegal.com